The PEOPLE of the State of
Colorado, Petitioner,

v.

Paul Anthony SAIZ, Respondent.

No. 99SC513.

Supreme Court of Colorado,
En Banc.

Sept. 10, 2001.

Ken Salazar, Attorney General, Deborah Isenberg Pratt, Assistant Attorney General, Appellate Division, Criminal Justice Section, Denver, CO, Attorneys for Petitioner.

David S. Kaplan, Colorado State Public Defender, Joan E. Mounteer, Deputy State Public Defender Denver, CO, Attorneys for Respondent.

Justice COATS delivered the opinion of the court.

The People sought review by certiorari of the court of appeals' judgment in *People v. Saiz,* No. 97CA1665 (Colo.App. Apr. 1, 1999) (not selected for publication), reversing the defendant's conviction for second degree murder. The court of appeals held that the trial court abused its discretion by excluding as cumulative and unnecessary certain video-taped statements of the defendant's son that were inconsistent with his testimony at trial responding to questions about being coached. Because the trial court acted within the range of its discretion in concluding that the purpose for which the videotaped statements were offered had already been accomplished through cross-examination of the detective to whom the statements were originally made, and because the defendant was not deprived of a constitutional right to confront adverse witnesses and present a defense, the holding of the court of appeals is reversed.

## I.

The charges against the defendant arose from the homicide of his common-law wife, Sherry Padilla, during the night of September 13–14, 1993. She was killed by a single shot to the face from a .45 caliber, semiautomatic pistol that was found, along with the body, in the house where the two lived. The defendant reported finding the body when he returned home from socializing with friends. He notified a neighbor, who called the police. The couple's four-year-old son, Anthony, who was the only self-professed witness to the murder, told the police that Mexicans shot

his mother, and he specifically identified a man named Rueben Gutierrez–Ruiz. Gutierrez–Ruiz admitted having been intimately involved with the victim and having been with her and Anthony earlier that day, but he provided an alibi for the time of the murder.

After the murder, Anthony spent time in foster homes and lived for twenty-two months with the defendant's sister and brother-in-law. In April 1996, the victim's mother acquired custody of Anthony. Several months later, almost three years after the murder, Anthony's sixteen-year-old maternal aunt, Leslie Padilla, recounted to Anthony's therapist, with Anthony's confirmation, his recent revelation to her that his father was actually the person who shot his mother. In a videotaped interview with Detective Weyler on July 26, 1996, Anthony repeated his changed account of the murder in greater detail.

The defendant was charged with first degree murder in October 1996 and went to trial in May 1997. It was the prosecution's theory that the defendant shot his wife while Anthony lay in bed beside her, and that after the murder, he walked Anthony around a field for some time and instructed him to tell the police that Rueben had shot his mother. Apart from Anthony's testimony, the prosecution presented a largely circumstantial case designed to demonstrate that the police were unable to find evidence of forced entry or another person's presence in the house; that the defendant actually arrived home almost two hours before giving notice of the murder, that the defendant owned a .45 caliber semiautomatic pistol; that the defendant was aware of his wife's relationship with Gutierrez Ruiz; and that Gutierrez–Ruiz could not have committed the murder because he was elsewhere on that night. The prosecution also presented the testimony of eight-year-old Anthony, who described how his father shot his mother one time, despite Anthony's protestations, and explained that he initially accused Rueben because his father had told him to do so and because he did not want his father to go to jail. In addition, the prosecution presented the testimony of several witnesses to whom Anthony had spoken about the murder, including Anthony's

therapist, his maternal aunt, and Detective Weyler.

The defense theory was that the defendant was not present when the murder occurred and that his wife's relatives had coached Anthony to accuse his father of the murder. The defense produced evidence designed to implicate Rueben, to indicate that the victim was involved in drug dealing, and to support the claim that the defendant did not arrive home until 3:30 or 4:00 in the morning, shortly before reporting the murder. It also presented Anthony's earlier statements about the murder, accusing Rueben and exonerating the defendant, including Anthony's reaffirmations of that account during the time he lived with the defendant's brother-in-law. In addition it presented expert opinion to the effect that Anthony's changed account of the murder was consistent with his having been coached by the victim's family.

The defendant was acquitted of first degree murder but convicted of second degree murder and sentenced to forty-eight years in prison. He appealed his conviction to the court of appeals, challenging the trial court's determination that Anthony was competent to testify as well as the exclusion of certain videotaped statements by Anthony. Although the court of appeals found no error in declaring Anthony competent to testify, it held that Anthony's videotaped statements should have been admitted. The court found that the statutory foundational requirements for prior inconsistent statements had been met and that the tapes would have been "the best and most efficient way to convey accurately to the jury the effect of the maternal aunt's statements on the child and the confusion of the child between what happened and what had been suggested to have happened."

This court granted the People's petition for writ of certiorari, challenging the appellate court's reversal for exclusion of Anthony's videotaped statements, but denied the defendant's petition that again sought to reverse the trial court's determination that Anthony was competent to testify.

## II.

At trial, the defendant's counsel sought to impeach Anthony's earlier testimony with

videotaped statements made during Anthony's July 26, 1996 interview with Detective Weyler. When Anthony testified at trial, defense counsel asked him what he had been told about the murder by his grandmother and his Aunt Leslie. Although Anthony denied he had been told about certain things, defense counsel did not confront him with his prior statements or ask him to clarify apparent discrepancies. During the subsequent testimony of Detective Weyler, defense counsel inquired about Anthony's responses to similar questions asked by the detective during their July interview. Following the detective's acknowledgment of several statements made by Anthony in that interview that appeared to be inconsistent with his trial testimony, defense counsel offered into evidence a videotape of Anthony actually making some of those statements.

In response to objections about this approach to impeachment by prior inconsistent statement, in which the out-of-court statements were introduced through a witness other than the person making them, defense counsel made clear that he was nevertheless offering the videotaped statements to impeach Anthony rather than the detective, pursuant to both CRE 613 and section 16–10–201. Defense counsel also made clear his understanding that he had satisfied the foundational requirements for impeachment by prior inconsistent statement, even though he had not confronted Anthony with his prior statements, and that despite Detective Weyler's testimony conceding that Anthony made the statements to him, the jury was entitled to hear Anthony's own words. The trial court denied admission, concluding that to the extent the videotaped statements were offered to impeach Anthony by showing he made the same conflicting statements that had already been conceded by Detective Weyler, that purpose had been adequately accomplished by the detective's testimony.

■ The use of prior inconsistent statements in criminal trials in this jurisdiction is expressly governed by both statute and rule.

*See Montoya v. People,* 740 P.2d 992 (Colo. 1987) (harmonizing CRE 613 and section 16–10–201, 6 C.R.S.2000). CRE 613 comports generally with prior case law by prohibiting examination of a witness for impeachment by prior inconsistent statement until his attention has been called to the time, place, and circumstances of the prior statement and by barring the admission of extrinsic evidence to prove any prior statement that is conceded by the witness. *Id.* at 995–96. Unlike CRE 613, section 16–10–201, creates "a new rule of substantive evidence" for criminal cases, *see People v. Smith,* 182 Colo. 228, 234, 512 P.2d 269, 272 (1973), by eliminating the hearsay impediment to using prior inconsistent statements for the purpose of establishing a fact to which witness' testimony and prior statement relate, as long as the witness is still available and his prior statement relates to a matter within his own knowledge.[1] *Montoya,* 740 P.2d at 997–98.

■ While section 16–10–201 also relaxes the foundational requirements for impeachment by prior inconsistent statement in some respects, CRE 613 does not conflict with the statute in every instance and continues to have application in civil cases and in criminal cases in which the foundational requirements of the statute are not met. *Id.* However, "[w]hen evidence of a witness' prior statements is properly admitted for substantive purposes under section 16–10–201, it thereby qualifies for admission for impeachment purposes pursuant to the express provision of the statute, independently of the foundation requirements of CRE 613." *Id.* at 997 & n. 4.

■ Although the statute eliminates the hearsay impediment to the use of prior statements to prove the truth of the matters asserted therein, *People v. Madril,* 746 P.2d 1329, 1335 (Colo.1987) (paraphrasing *Montoya,* 740 P.2d at 997–98), extrinsic evidence of a prior inconsistent statement must still be "otherwise competent" for the purpose for

1. Unlike Fed.R.Evid. 801, CRE 801 (adopted after section 16–10–201) also removes the hearsay impediment to the admissibility of prior inconsistent statements for substantive purposes under some circumstances by treating statements of a

witness that are inconsistent with his testimony as falling outside the definition of hearsay, even if they were not made under oath at a trial or hearing. *See* CRE 801(d)(1)(A); *Montoya,* 740 P.2d at 996 n. 3.

which it is offered. *See* § 16–10–201(1). As applied to evidence generally, the term "competent" means that the evidence satisfies the requirements of admissibility and tends to establish the fact at issue. *See Black's Law Dictionary* 284 (6th ed.1979) (defining "competent evidence" as "generally, admissible (*i.e.*, relevant and material) as opposed to 'incompetent' or 'inadmissible' evidence"); *see also Mathes v. City of Omaha*, 254 Neb. 269, 576 N.W.2d 181 (1998) (that which is admissible and relevant to the point in issue); *Joseph A. Coy Co. v. Younger*, 192 Okla. 348, 136 P.2d 890, 892 (1943) (that which is relevant and material to the issue to be determined).

■ As *Montoya* makes clear, evidence of a prior statement that is otherwise inadmissible, or incompetent, to prove the substance of the statement, fails to satisfy a foundational requirement of section 16–10–201 for substantive use. 740 P.2d at 997 (noting by way of example that prior custodial statements taken in violation of *Miranda* or statements made in connection with a guilty plea, which for other reasons may not be used for substantive purposes, fail to satisfy the foundational requirements of 16–10–201 and may at most be admissible for impeachment purposes pursuant to CRE 613).

■ Foremost among the requirements of competence or the admissibility of evidence are the rules governing relevance. *See* CRE 401–403. Evidence which is not relevant is not admissible. CRE 402; *cf. Callis v. People*, 692 P.2d 1045, 1052 (Colo.1984) (narrowing an earlier articulation of "rule of completeness" because it had apparently allowed admission of an accused's entire statement whenever a portion of it was admissible, without regard to the rules of relevance). A trial court has considerable discretion not only in determining whether evidence has logical relevance, by tending to prove a material fact, *see* CRE 401, but also whether it is sufficiently probative of that fact to avoid exclusion for various policy reasons. *See* CRE 403; *People v. Ibarra*, 849 P.2d 33, 38 (Colo.1993). Even evidence that is logically relevant pursuant to CRE 401 may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. CRE 403.

■ In balancing probative value against the countervailing policy considerations of CRE 403, an item of evidence should not be viewed as an island. *See Old Chief v. United States*, 519 U.S. 172, 182–85, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997); *see also* 2 Jack B. Weinstein, *Weinstein's Federal Evidence* § 403.02[2][a] at 403–13 (2d ed.2001). The probative worth of any particular bit of evidence is affected by the scarcity or abundance of other evidence on the same point, *Old Chief* at 185, 117 S.Ct. 644 (quoting from 22 Charles Alan Wright & Kenneth W. Graham, *Federal Practice and Procedure* § 5250 at 546–47 (1978)), and unlike Rule 401 "relevance," Rule 403 "probative value" may be calculated by comparing evidentiary alternatives. *Id.* at 184, 117 S.Ct. 644. Rule 403's "probative value" therefore signifies the "marginal" or "incremental" probative value of evidence relative to other evidence in the case. *See id.* at 185, 117 S.Ct. 644 (citing 1 McCormick 782 & n. 41 (4th ed.1992)); *People v. Nuanez*, 973 P.2d 1260, 1263 (Colo. 1999) (finding that deferred judgment was not merely cumulative of habitual traffic violations where it carried "incremental probative value" by demonstrating an additional incentive to flee from police). In determining whether the probative value of proffered evidence is substantially outweighed by other considerations, this court has also described the trial court's duty as requiring consideration of "the logical force of the evidence and the proponent's need for the evidence," in light of other available evidence. *Martin v. People*, 738 P.2d 789, 794 (Colo.1987) (mittimus showing conviction for attempted murder neither necessary nor more logically forceful to prove lawful confinement than stipulation to lawful confinement offered by defendant).

■ Finally, error may not be predicated upon a ruling that excludes evidence unless a substantial right of the proponent is affected and the substance of the evidence is made known to the court by offer of proof or is

apparent from the context within which questions were asked. CRE 103; *see Itin v. Ungar*, 17 P.3d 129, 135 (Colo.2000). The offer must sufficiently apprise the trial court of the nature and substance of the testimony to enable it to exercise its discretion pursuant to the rules of evidence, and it must establish a basis in the record for appellate review of the trial court's ultimate ruling. *Lanari v. People*, 827 P.2d 495, 503 (Colo. 1992). With regard to considerations of relevance, this necessarily requires that the trial court be adequately apprised of the purpose for which the evidence is offered. *See Larsen v. Archdiocese of Denver*, 631 P.2d 1163, 1164 (Colo.App.1981); *State v. Dixon*, 668 S.W.2d 123, 126 (Mo.App.1984) (cited with approval in *Lanari* ).

The videotaped statement that was actually offered by the defense and excluded by the court was relatively limited in nature. While Anthony's testimony identifying his father as the murderer was in direct conflict with his earlier statements accusing Gutierrez–Ruiz, and was central to the charge at issue, the defense was in no way limited from introducing extrinsic evidence of those statements. In fact, the defense was not only permitted to introduce extrinsic evidence of those statements through other witnesses, but also to play for the jury the videotapes of Anthony's earlier interviews identifying Rueben as the killer. Rather, defense counsel singled out Anthony's testimony "that his Aunt Leslie never told him anything about the shooting,"[2] as the statement that he sought to contradict, or impeach, and he requested permission "to play that statement of Anthony where he says something directly contrary to what he said on the witness stand." When the offer was denied, defense counsel asked that the videotape be marked as Exhibit O, but did not further identify or summarize the various statements of Anthony that were spliced together on the tape, nor did he request that the court view the tape.

Moreover, defense counsel offered the videotaped statements solely for the purpose of impeaching Anthony. There was no contention that the language on the tape would be different from that to which Detective Weyler had already testified or that anything about the demeanor of the child would alter the meaning of that language. Nor did counsel suggest that actually seeing the tape would be more probative of what Anthony had been told by his aunt. Perhaps most importantly, counsel never suggested the videotape would demonstrate which account of the murder was true or that Anthony lacked the present capacity to even know which account was true. Without offering the videotape for any purpose other than to impeach Anthony's testimony about coaching by his aunt, the defendant's counsel asserted that this additional extrinsic evidence was admissible simply because it was a videotape of Anthony's own words.

■■■■ Contrary to the presumption inherent in the defense offer, no rule or principle of evidence requires the admission of tape recordings, either in addition to or in place of testimony about events that are depicted in recordings. Videotapes, like photographs, are ordinarily competent to illustrate or explain anything a witness may describe in words, *see Lanford v. People*, 159 Colo. 36, 409 P.2d 829(1966); *People v. Avery*, 736 P.2d 1233, 1238 (Colo.App.1986); Carl T. Drechsler, Annotation, *Admissibility of Videotape Film in Evidence in Criminal Trial*, 60 A.L.R.3d 333 (1974), but they are not the only, or necessarily the best, evidence of the events. *Cf. People v. Newbrough*, 803 P.2d 155, 161 (Colo.1990) (camera angles and lighting can affect juror's impressions and videotaped interviews can be used to present slanted or distorted testimony). Videotaped interviews, like other forms of evidence, are subject to the rules governing the admissibility of evidence and are not automatically admissible as original documents. Nor are

---

**2.** Defense counsel was apparently referring to Anthony's negative answer to the leading question, "And your Aunt Leslie has told you what happened when your mom got shot?" However, Anthony had answered, "Yeah," to the preceding question, "[Y]ou have talked with your Aunt Leslie too about what happened when your mom got shot; is that true," and he immediately answered a series of specific questions about what his Aunt Leslie had told him about the shooting, admitting some things and denying others.

they necessarily more probative than other evidence depicting the same events.

■■ The preference for originals, or so-called best evidence rule, is a rule of documentary evidence that requires an original, under some circumstances, to prove the contents of a document or recording. *See* CRE 1001–1002. It is a rule limiting the admission of copies rather than a rule requiring the admission of an original recording, and in any event it has no application where the recorded events themselves, rather than the contents of the document recording them, are at issue. *Id.* Otherwise competent testimony of first-hand sense impressions is admissible to prove what occurred, despite the availability of a videotape depicting the same event. *Cf. Banks v. People,* 696 P.2d 293, 297–98 (Colo.1985) (transcript of event was original of equal dignity with tape recording and could not be excluded by best evidence rule).

While videotaped recordings of conversations or interviews may well have probative value beyond the mere recitation of the language used in the interview, that is not always the case. Depending upon the particular circumstances of the case, including the other admitted or available evidence, the nature and import of nonverbal activity depicted on the tape, and the material purpose for which the tape is offered, the "marginal" or "incremental" probative value of the tape may be minimal or nonexistent. And even if marginally probative for some material purpose, when balanced against the countervailing considerations of CRE 403, a videotape may not be relevant in the legal or policy sense contemplated by the rule.

■■ Since a trial court must determine whether the probative value of a videotape depiction is outweighed by countervailing policy considerations, the proponent of the tape is not relieved of the obligation to make an offer of proof sufficient to apprise the court of its nature and relevance. Even though an excluded videotape, unlike excluded live testimony, permits a reviewing court to know what the excluded evidence would have shown, it cannot by itself provide an adequate basis for review of the trial court's ruling on admissibility. Whether a trial court abuses its discretion in excluding evidence depends upon the offer of proof under consideration by the trial court rather than a later assessment of the value of the evidence by a reviewing court. *See Brewer v. Motor Vehicle Div., Dep't of Revenue,* 720 P.2d 564, 570 (Colo.1986) (without offer indicating how proponent would benefit from introduction, there is no basis for claim of improper exclusion of evidence). While it may be appropriate, under certain circumstances, for a proponent of evidence to request, or for a trial court to demand, to view an offered videotape in aid of a ruling on its admissibility, a trial court cannot be charged with knowing the contents of a videotape merely because it was offered into evidence, any more than it could be required to hear offered testimony outside the presence of the jury before sustaining an objection to its admission.

■■ A trial court also cannot be considered to have abused its discretion in excluding logically relevant evidence as needlessly cumulative unless its decision, under the circumstances, was manifestly arbitrary, unreasonable, or unfair. *People v. Gibbens,* 905 P.2d 604, 607 (Colo.1995); *Ibarra,* 849 P.2d at 38. In ruling on the defendant's offer, the trial court entertained arguments outside the presence of the jury and carefully narrowed its evidentiary ruling to the offer before it. In response to the court's inquiry why Anthony's trial testimony had not already been impeached adequately by admission of the very statement at issue through Detective Weyler's testimony, defense counsel merely indicated that Detective Weyler's testimony was not Anthony's words. For the purpose of impeaching Anthony's testimony by showing that he said something different on a different occasion, a videotape showing Anthony actually making the inconsistent statement carried little if any probative value beyond that of the uncontested testimony of the officer to whom Anthony made the statements. A videotape showing a prior inconsistent statement that had already been shown by uncontested testimony was clearly cumulative, and in the absence of an offer that it would be probative of more than merely the fact that the witness made the statement, it was needlessly cumulative.

■ Not only was the trial court not presented with an additional, substantive purpose for receiving the evidence; the defense never specified the statements that would appear on the tape or asked the court to view the videotape. Defense counsel never suggested that the tape would demonstrate the "confusion of the child between what happened and what had been suggested to have happened," *People v. Saiz*, No. 97CA1665, slip op. at 6–7 (Colo.App. Apr. 1, 1999), or how he "appeared to move seamlessly between his recollection and his maternal aunt's version of the murder." *Id.* at 6. Even if the appellate court's highly subjective characterization of the tape could be considered objectively accurate, a trial court does not abuse its discretion merely by failing to discover reasons why an offered videotape might have probative value beyond those for which it was offered.

### III.

■ In light of the other evidence already admitted and the offer of proof before it, the trial court's ruling amounted to little more than a determination that under the circumstances of this case the defendant was not entitled to introduce a videotape to show the same statements that it had already shown by uncontested testimony. Even if the videotape had been offered for the broader purposes suggested by the court of appeals, however, and the trial court had actually viewed the tape as the court of appeals did, it nevertheless could not fairly be said by a reviewing court that exclusion of the evidence would have amounted to an abuse of discretion or a violation of the defendant's constitutional rights to confront adverse witnesses and present a defense.

■ While rights secured by the federal and state constitutions inform and shape the limits of a trial court's discretion to control cross-examination and exclude evidence offered by a criminal defendant, they do not eliminate that discretion or guarantee that a defendant be permitted to present all the evidence he wishes or do so in the manner he chooses. *See Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) ("Relevant evidence may be barred as long as the defendant is not prohibited outright from utilizing the opportunity to present a defense."); *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (Sixth Amendment "guarantees a defendant an opportunity for effective cross-examination [and to present a defense] but it does not guarantee that this cross-examination be effective in whatever way, and to whatever extent the defense may wish"); *Merritt v. People*, 842 P.2d 162, 166 (Colo. 1992) (despite Confrontation Clause, trial court retains wide discretion to place reasonable limits on cross-examination based on considerations of CRE 403).

■ A trial court retains the discretion to assess the incremental probative value of evidence offered by a criminal defendant and to exclude even logically relevant evidence that would be more wasteful of time, confusing, or misleading than helpful to the jury. *Id.* While a trial court must be particularly mindful to insure that a criminal defendant not be denied any meaningful opportunity to challenge evidence of his guilt, and that any decision to exclude defense evidence be well-supported in the record, it may not abdicate its responsibility to guard against prejudice and promote judicial efficiency by excluding evidence that is insufficiently probative to assist in the search for truth. *Cf. People v. Cole*, 654 P.2d 830, 833 & n. 4 (Colo.1982) (emphasizing balance between defendant's rights and court's responsibilities in the context of limiting cross-examination). The defendant was given ample opportunities, *see Van Arsdall*, 475 U.S. at 679, 106 S.Ct. 1431; *Chambers v. Mississippi*, 410 U.S. 284, 296–97, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), to present his theory and to challenge Anthony's statements and capacity. He took advantage of those opportunities through a number of sources and in a myriad of ways, in light of which any marginal probative value of viewing Exhibit O could not compel its admission.

The tape marked Defendant's Exhibit O was about two minutes long and consisted of three isolated segments, spliced together by the defense from a forty-five minute interview. Although the segments showed Anthony attributing several statements to his aunt

that he later denied at trial, and denying his personal recollection about the murder at one point when he was directly confronted by Detective Weyler, the vast majority of the interview contained his emphatic assertions of having personal knowledge and recollections of specific details of the murder, not attributed elsewhere to his aunt.[3] Furthermore, the substance, if not the exact wording, of the statements offered by the defendant had already been admitted through the testimony of Detective Weyler.

The videotape did not contain any obvious nonverbal conduct or changes in intonation or expression that would have given a different meaning to Anthony's transcribed words. Nothing in the videotape lent support to Anthony's earlier account of the murder, which was substantially impeached by Gutierrez–Ruiz's alibi witnesses. To the extent that any subtle, nonverbal mannerisms or reactions of Anthony could have been probative of his capacity to distinguish what his aunt had told him from his own recollections, they were not the only, or even primary, evidence from which the jury could make this determination. The evaluation of Anthony's capacity to recall what really happened on the night of the murder and the existence of outside influences and pressures on him to change his story occupied a major portion of the trial.

The jury was able to watch Anthony testify about both his former and current versions of the murder and observe his fragility, suggestibility, and, at times, obvious confusion about what he was being asked. The jurors saw him openly admit that he never disagreed with his maternal grandmother or his Aunt Leslie and that his grandmother had talked with him about the night of the murder and told him the best way to say things. Although he denied at one point that his Aunt Leslie told him what happened, he readily agreed that he talked with her about the night of the murder. The jury also saw him concede that he thought his aunt had told him that his ears were screaming when the shot was fired and that she related things his deceased mother had told her in her

dreams. The jury even observed Anthony testify on direct examination that his earlier statement that Rueben shot his mother was the truth, and immediately thereafter, without explanation, return to his assertion that his father shot his mother. The jury was not shielded in any way from Anthony's apparent contradictions but was able to observe, first hand, the nuances in questioning that led to his different responses. Nor was the defense limited from cross-examining Anthony to expose any bias, motive, or outside influences that might have affected his truthfulness or capacity.

At the same time the jury was able to observe and evaluate Anthony's testimony to the effect that he was there at the murder scene and remembered the night that his mother died. Although through leading questions, and at times contradicting himself, Anthony related details of the murder, including that his father shot his mother only one time, in the bedroom where his aunt currently lived; that he saw the gun and said, "No," lots of times; that the noise made his ears scream; that his father took him into a field, where they walked a long way, and told him to say that Rueben did it; that he did as his father instructed because he did not want his dad to go to jail; that his dad did not really get blood on him from hugging his mother; and that he knew his dad was sad because he cried. The jury was able to see and evaluate Anthony's way of responding to questions, at times denying any knowledge or recollection and moments later giving graphic details in response to more specific or leading questions, in much the same manner as he did in the July 26 interview.

Apart from Anthony's trial testimony itself, the jury was permitted to compare Anthony's initial videotaped statements identifying Rueben as the murderer with his trial testimony naming his father. The defense presented several psychological experts expressing their opinions that Anthony had been coached to change his story by the victim's relatives, including Anthony's therapist of eighteen months who gave specific

---

**3.** Although it was not offered or admitted into evidence, a transcript of the entire interview was marked as People's Exhibit 4 and included in the record for appeal.

details about questionable statements Anthony made to her during the course of the therapy. Despite her concerns in that regard, however, Anthony's therapist also testified that Anthony told her during that period that he knew what happened but could not tell her, and he consistently indicated that his father was present when his mother was murdered.

A trial court must retain discretion to exclude even logically relevant evidence pursuant to CRE 403 precisely because the determination involves so many possible considerations. Whether any additional probative value the evidence may have is outweighed by the disadvantages of its admission is a complex and imprecise determination. The considerations militating against admission of a videotape like the one at issue here are not limited to a delay of several minutes. The evaluation of both the probative value of the tape and its potential for delay, confusion, and misleading of the jury necessarily involves consideration of the entire interview of which it was but a part, *see* CRE 106, as well as the likelihood of reexamination of the child-witness, whose continued availability was a foundational requirement of impeachment. *See* § 16-10-201. Although it clearly would be within a trial court's discretion to admit the videotape in a case such as this, there was also abundant justification for a finding of minimal incremental probative value and substantial potential for delay, confusion, and misleading of the jury. Finding an abuse of discretion where the defendant was permitted to impeach the witness and present his theory so thoroughly and in so many ways, and where the probative value of any nonverbal conduct appearing on the videotape was of such debatable and subjective value, would be tantamount to requiring the admission of a videotape in addition to testimony of the same statements in virtually every case.

### IV.

In the absence of an offer to do more than impeach Anthony by showing his prior inconsistent statement on videotape, the trial court did not abuse its discretion in excluding the videotape on the grounds that the defendant's offered purpose had already been accomplished by extrinsic evidence from Detective Weyler. Even if the videotape had been offered to prove a fact to which Anthony's testimony and the inconsistent statement related, however, in light of the abundant evidence addressing Anthony's capacity and the truth of his statements that was admitted, excluding the videotape could not be said to amount to an abuse of discretion or deprivation of a constitutional right to cross-examine or to present a defense.

Accordingly, the judgment of the court of appeals is reversed, and the case is remanded with directions to affirm the defendant's conviction.

Justice BENDER dissents, and Justice MARTINEZ joins in the dissent.

Justice BENDER, dissenting.

In my view, it is inexcusable for the trial court to fail to permit the defense to impeach the key prosecution witness by showing a videotape of an interview with a seven-year old child in which that child changed his eye-witness account of who killed his mother almost three years after the event. Trial judges possess broad discretionary powers to tailor and to limit relevant evidence, but this power should not be wielded, as it was here, to subvert our basic notions of fairness. Hence, I respectfully dissent from the majority opinion and would affirm the court of appeals' reversal of the defendant's conviction and order of retrial.

At age four, the son of the defendant, Anthony, witnessed his mother being shot to death. Shortly after the incident, Anthony told police that another person killed his mother, identifying his mother's boyfriend as the killer. Anthony was placed in the home of his father's sister until the fall of 1995. In November 1995, one month after he turned seven, Anthony was placed in the custody of his father. In the spring of 1996, however, social services removed Anthony from his father's home and gave custody to his maternal grandmother. Anthony's mother's sister, Aunt Leslie, also lived in his grandmother's home. Almost four months after living at

this home, Anthony told police that his father, the defendant, and not the boyfriend, shot his mother. At this time Anthony was seven years old.

The defendant's trial occurred almost a year later. Anthony, now eight years old, told the jury that his father shot his mother. Anthony's testimony on direct contained confusing accounts of what happened the night of the murder. For instance, when questioned by the prosecutor, the following sequence of questions and answers occurred:

Q: Did your dad say anything about the shooting [that night]?

A: No.

Q: Did he say whether or not to tell somebody that somebody else did it?

A: Yeah.[1]

On cross-examination Anthony denied that his Aunt Leslie provided him with details about the shooting such as telling him "that the gun was fired only once" and that "it had to have been [his] dad because if it had been someone else they would have shot [him] too." Because there was limited circumstantial evidence linking his father to the killing, both the prosecution and defense focused their theories, evidence, and argument on the question of whether this young boy was now telling the truth. The prosecution claimed that the father coached the boy to lie by telling the police that the boyfriend did it, while the defense claimed that the victim's family coached the boy to lie and tell police that his father did it.

As a matter of trial tactics the defense attorney chose not to elicit Anthony's inconsistent statements during Anthony's cross-examination. Instead, the defense attorney attempted to discredit Anthony's eye-witness trial testimony of the killing during the cross-examination of the detective who interviewed Anthony on video in July 1996. During this interview, Anthony changed his account to say that his father killed his mother. The record does not indicate why the defense attorney chose to introduce the inconsistencies in Anthony's testimony through the detective instead of confronting Anthony directly. Common sense, however, tells us that Anthony was severely traumatized by his mother's murder and subsequent investigation, and that a confrontation with Anthony. the son of the defendant, on cross-examination might increase the harm already done to this child.

The majority implies that the defense attorney acted deficiently by failing to impeach Anthony while the boy was on the stand. *See* maj. op. at 445. Our statute and case law, however, permit impeachment of prior inconsistent statements by extrinsic evidence without first laying a foundation with the witness who made the inconsistent statement. § 16–10–201(1), 6 C.R.S. (2000) ("[T]he previous inconsistent statement may be shown by any otherwise competent evidence...."); *People v. Stewart*, 39 Colo.App. 142, 144, 568 P.2d 65, 67 (1977) (concluding that it was permissible under section 16–10–201 for a detective to testify as to a witness's prior inconsistent statement).

Further, under our law an inconsistent statement may be admitted both for impeachment purposes and as substantive evidence. § 16–10–201(1) ("[T]he previous inconsistent statement ... is admissible not only for the purpose of impeaching the testimony of the witness, but also for the purpose of establishing a fact to which his testimony and inconsistent statement relate."); *People v. Dist. Court*, 195 Colo. 570, 572–73, 580 P.2d 388, 389 (1978) ("[S]ection 16–10–201

---

1. Other examples of his confusion about what happened that night when questioned by the prosecutor are:

Q: Did you talk to policemen when they came to the house?
A: Yeah.
Q: And what did you tell them ... ?
A: I don't know.
Q: Did you tell them about the shooting?
A: Um, na.
Q: I don't mean the truth, but did you tell them something that happened?

A: Um, no.
Q: Did you tell them, did you say who shot your mom?
A: Yeah.
And again:
Q: "Was it the truth that Rueben shot daddy I mean Reuben shot mommy?"
A: Yeah.
Q: Is that the truth or the lie?
A: The truth.
Q: I thought you said daddy shot mommy?
A: He did.

expressly allows use of these [inconsistent] statements as substantive proof....."). In other words, evidence of prior inconsistent statements may be used both to discredit a declarant and to prove the truth of the matter stated in the prior inconsistent statements.

Defense counsel possessed a videotape of the child's inconsistent statements made to police in an interview almost three years after the killing. This video conveys to the jury firsthand sense impressions of critical facts. *See* Jordan S. Gruber, *Videotape Evidence, in* 44 Am.Jur. Trials 171, 195 (1992). According to Colorado law, it was perfectly appropriate for defense counsel to seek to introduce impeachment evidence through the detective, not only for the purpose of discrediting the child's testimony, but also as substantive evidence of coaching by the child's aunt.

Defense counsel laid a foundation for the admission of the videotape by questioning the detective about its contents, in other words, about what the boy said in the videotaped interview. The boy told the detective "that he knew his mom had been shot in the head because his Aunt Leslie told him that." The detective also testified that he made a pinky promise with the boy to tell the truth. The detective asked, "What do you remember, not what your Aunt told, just what do you remember?" The boy answered, "I don't know." Next, when questioned about whether the boy remembered anything from that night, he answered, "nut-huh." Defense counsel then established that the boy's statement was videotaped:

Q: He told you that he knew it was his dad who shot his mom because his Aunt Leslie had told him that if it wasn't his dad they would have killed Anthony too?

A: He made that statement in one portion of the interview.

Q: And you make a pinky promise with him?

A: I made a pinky promise with him to tell me the truth, yes.

Q: And you asked him, "What do you remember, not what your Aunt told, just what do you remember?"

A: That's correct.

Q: And he said, "I don't know?"

A: Right at that point.

Q: And you asked him, "Do you remember anything about that night?"

A: I did ask him that, yes.

Q: And he said, "Nut-huh."

A: That is his initial, next statement.

Q: And that was videotaped, wasn't it?

A: That is correct.

Next the defense attorney attempted to introduce the videotape of these portions of the interview. The prosecution objected, first on the basis that it was improper impeachment since the person being impeached was the child and not the detective, and second on the basis that the evidence was cumulative. In response, the defense attorney told the court that the video contained "something directly contrary to what [Anthony] said on the witness stand." Defense counsel argued that the jury was entitled "to *see* [the child] say something completely different." (Emphasis added.) He argued that it was not enough for the jury to hear the detective's testimony as to the content of the inconsistent statements "because it was not Anthony's words. I have Anthony's words on video."

The majority states that "[i]n the absence of an offer to do more than impeach Anthony by showing his prior inconsistent statement on videotape, the trial court did not abuse its discretion in excluding the videotape on the grounds that the defendant's offered purpose had already been accomplished by extrinsic evidence from Detective Weyler." Maj. op. at 451. An offer of proof must make the substance of the evidence known to the court and inform the trial judge what counsel expected to prove by the excluded evidence. CRE 103(a)(2); 1 Jack B. Weinstein and Margaret A. Berger, *Weinstein's Federal Evidence* 103–34 (Joseph M. McLaughlin ed., 2d ed.2001). In this way, the proponent of evidence provides the trial court with contemporaneous knowledge about the proposed evidence, so that the judge can make a proper ruling on the evidence at the time it is

offered. Weinstein, *supra* at 103–37.[2] An offer of proof may be accomplished if the proponent makes a formal offer or if the grounds for offering the evidence were apparent from the context. *Itin,* 17 P.3d at 136; Weinstein, *supra* at 103–39.

In my view, defense counsel's argument that the jury should "see" and "hear" Anthony's statement on the video sufficiently informed the trial court of the probative value of the videotape not merely for the content of its statements, but for the way in which Anthony made his statements as well. Central to both parties' trial theories was the credibility of a young and traumatized witness who changed his testimony and possessed different cognitive and developmental capabilities over time, including varying truth-telling capacities at age four, when he witnessed the event; at age seven, when he recanted his initial account; and at age eight, when he testified. The way in which he told his story at age seven, when he recanted and admitted to some degree of coaching by his aunt and that "he basically didn't remember what happened that night," is critical to the trial of this case. The trial court did not need additional offers of evidence to understand the potentially powerful, probative value of this video.

Merely stating the content of these inconsistent statements does not convey Anthony's cognitive development, demeanor, and body language at the time he made his statements. Empirical evidence has shown that when we communicate, we use words (or verbal forms) about 7% of the time and nonverbal forms 93% of the time. Albert Mehrabian, *Communication Without Words,* Psychol. Today, Sept. 1968, at 53. Non verbal forms of communication include touching, tone of voice, rate of speech, facial expressions, posture, and gestures. *Id.*

The notion that non-verbal cues are a vital tool for fully understanding a person's state-

ments has deep cultural roots. *See* Center for Nonverbal Studies, *Notable Quotables,* at *http://members.aol.com/nonverbal3/nvquotes.htm* (Aug. 31, 2001) (quoting Ralph Waldo Emerson as saying, "[w]hat you do speaks so loud that I cannot hear what you say," and quoting anthropologist Edward Sapir as saying in 1927, "we respond to gestures with an extreme alertness and, one might almost say, in accordance with an elaborate and secret code that is written nowhere, known by none, and understood by all"). This axiom has been absorbed by, commented upon, and assimilated by popular culture as well. For example, in the popular television sitcom "Seinfeld," Kramer says, "Ninety-four percent of our communication is nonverbal, Jerry." Seinfeld (NBC television broadcast, Jan. 29, 1998).

The detective's paraphrase of Anthony's statements could not and did not convey Anthony's non-verbal forms of communication. The video of the interview, however, aptly captures not only Anthony's words but also captures his nonverbal communication cues. Hence, the video possesses far more probative and persuasive force than the same statements repeated by someone else.

Contrary to the majority's position, this video was not cumulative of the detective's testimony. Evidence, though cumulative to some extent, is admissible "if it sheds light on a material inquiry or illustrates the transaction at issue." *Lira v. People,* 166 Colo. 498, 501–02, 445 P.2d 62, 64 (1968) (citing 22A C.J.S. Criminal Law § 713). The detective repeated what Anthony said to the effect that Anthony recanted, admitted that he was partially coached by his aunt, and stated that he could not remember anything that happened that night. As such, these statements, which were inconsistent with Anthony's testimony, set forth the foundation for admission of the videotape into evidence and placed Anthony's inconsistent words in context. *See People v. Barker,* 101 Mich.App. 599, 300

---

2. An offer of proof not only allows the trial court to make an informed ruling on the admissibility of evidence, it also preserves a right of appeal. CRE 103(a)(2); *Itin v. Ungar, P.C.,* 17 P.3d 129, 136 (Colo.2000). In order to distinguish between the two purposes of an "offer of proof," one treatise on evidence uses the term an "offer of evidence" to describe an offer that allows the

"trial court ... [to] rule intelligently on the admissibility of the offeror's evidence." 1 John Henry Wigmore, *Wigmore on Evidence* 768 (rev. ed.1983). An offer of proof, however, is required "because an appellate court needs an adequate basis for determining whether a trial court's error regarding an evidentiary matter is prejudicial or merely harmless." *Id.* at 864.

N.W.2d 648, 650 (1981) (concluding that videotapes were not cumulative of officer's testimony elicited primarily for the purpose of laying the foundation for admission of the videotapes).[3]

Therefore, the videotape was not cumulative, and I would so hold. *See Grimes v. Employers Mut. Liab. Ins. Co. of Wis.*, 73 F.R.D. 607, 610 (D.Alaska 1977) ("Generally, photographic evidence is only cumulative of other photographic evidence of the same kind."); *State v. Hunt*, 53 Wis.2d 734, 193 N.W.2d 858, 867 (1972) (concluding that it was not cumulative to admit two videotapes of the same confession because "one of the tapes gave a better view of the facial expressions of [the declarant]").

I note that one commentator agrees with my conclusion that, provided the video is accurate and authenticated (neither of which was contested here), the evidentiary objection that the video is cumulative is misplaced unless the video replicates other admissible, photographic evidence:

> The ... modern[ ] view is that a videotape can properly only be cumulative of other types of photographic evidence, and perhaps only other photographic evidence of the same kind—that is, other videotapes or film motion pictures. Similarly, the modern view rejects the notion that the only way to defeat an objection as to cumulativeness is if the videotape is necessary to prove or disprove a material proposition, or if the videotape conveys information to the jury more thoroughly or more accurately than does testimony. Instead, the modern view holds that what is critical is whether the videotape is relevant and accurate, and aids rather than confuses the jury.

Gruber, *supra*, at 294 (footnotes omitted).

Additionally, I point out that our rules of evidence are to be construed "to secure fairness in administration ... to the end that the truth may be ascertained and proceedings justly determined." CRE 102; *see also Ber-*

*ger v. Coon*, 199 Colo. 133, 136, 606 P.2d 68, 70 (1980) (concluding that the policy underlying the Colorado Rules of Evidence is "to guarantee to each party an opportunity to present the testimony of adverse witnesses and to favor admissibility of their testimony so as to ascertain the truth within the bounds of fairness"). Use of a videotape of an interview is significantly more probative than a mere recitation of the content of that interview. "For jurors to see as well as hear the events surrounding ... [a] statement is a forward step in the search for the truth. And after all, the end for which we strive in all trials is that the truth may be ascertained and the proceedings justly determined." *Hendricks v. Swenson*, 456 F.2d 503, 507 (8th Cir.1972) (quotation marks omitted) (holding that where a proper foundation is laid, admission of the defendant's videotaped confession at trial did not violate the defendant's constitutional rights).

The jury should have had the opportunity to see this video in order to permit the defendant a fair opportunity to present his theory of defense—that Anthony did not remember what happened and was coached by his aunt. Criticism of defense counsel by the Majority for not expressly stating what were the contents of the video or playing of the video for the judge in my view is inappropriate. *See* maj. op. at 449. The majority's sanction of the trial court's exclusion of this key and critical piece of evidence impaired the defendant's constitutional right to present a defense and deprived him of his constitutionally guaranteed right to a fair trial.

Hence, I would hold that the trial court's exclusion of the video constituted an abuse of discretion and remand this case to the district court for a new trial.

I am authorized to state that Justice MARTINEZ joins in this dissent.

---

**3.** I note that both the court of appeals and the majority viewed the videotape and conducted their respective contrary analyses of the probative value of the substantive content of the video. Because the trial court did not view the videotape, I believe such substantive comment is inappropriate and unnecessary to rule on the question raised in this appeal: Whether the trial court abused its discretion when it precluded the defense from introducing this videotape into evidence. My holding rests solely upon the defense attorney's offer of evidence made in the context of this case.