Opinion by JUDGE DAILEY
¶ 1 Defendant, Franklyn J. Whitlock, appeals the judgments of conviction entered on jury verdicts finding him guilty of sexual assault on a child and sexual assault on a child by one in a position of trust. He also appeals the denial of probation. We affirm.
I. Background
¶ 2 The victim's mother, D.Q., married defendant when the victim was six months old. When the victim was eleven years old, D.Q. and defendant separated, and defendant moved out of their house. Sometime during the next six months, the victim stayed at defendant's house for a weekend. According to the victim, one night while she was sleeping, *670 defendant went into the bedroom, lay down beside her, removed her underwear, and touched her vagina. When she woke up and told him to stop, defendant left the room. Several years later, the victim told her new stepfather and her mother, who then contacted the police.
¶ 3 The People charged defendant with sexual assault on a child and sexual assault on a child by one in a position of trust (victim under fifteen years old). At trial, the prosecution presented, in addition to the victim's testimony, evidence of (1) admissions made by defendant during two pretextual telephone calls initiated by the victim; and (2) other bad acts committed by defendant.
¶ 4 Four defense witnesses (who were also present at defendant's apartment the entire evening of the incident) testified that the victim slept in the living room on a loveseat (as she always had), right next to the couch where defendant's mother slept. Defendant, his mother said, slept in a bedroom with his then girlfriend. The defense posited, as a reason why the victim might falsely accuse defendant, that she was upset with him for divorcing her mother and starting a new life with a new girlfriend.
¶ 5 The jury convicted defendant as charged, and the court sentenced him to a total of four years to life imprisonment in the custody of the Department of Corrections (DOC).
II. Evidence of Other Bad Acts
¶ 6 Defendant contends that the trial court reversibly erred when it admitted evidence of his prior bad acts. We are not persuaded.
¶ 7 Before trial, the People filed a motion to admit evidence of defendant's other acts concerning the victim's mother, D.Q., and D.Q.'s younger sister, J.N., for the purposes of proving identity, motive, and intent, and to rebut a defense of fabrication by the victim.
¶ 8 During a hearing, D.Q. testified that, in 2005, during the last year she lived with defendant, she would "wake up at night to him having sex with [D.Q.] and [she] would tell him to stop," but he would not. J.N. testified that, in 1996, when she was fifteen years old, one time after she changed clothes in the bedroom shared by D.Q. and defendant, defendant told her that he had watched her through the window and she had a "nice ass." J.N. also testified that defendant picked her up from work one night, pulled the car to the side of the road, and said, "[L]ook at this." When she looked over, defendant had his pants and underwear completely down and said, "Do you think that I have a nice set or what?"
¶ 9 The trial court found that it was "a very close question" as to whether any of the evidence should be admitted, but allowed the other acts evidence concerning both D.Q. and J.N., for purposes of proving identity, motive, and intent.
¶ 10 At trial, D.Q. and J.N. testified consistently with their testimony at the hearing.
¶ 11 Section 16-10-301, C.R.S. 2014, and CRE 404(b) govern the admissibility of other sexual misconduct evidence in sexual assault cases. The General Assembly has recognized that sexual offenses "are a matter of grave statewide concern," § 16-10-301(1), and has delineated the requirements for the admissibility of other acts evidence in those cases. People v. Jones, 2013 CO 59, ¶ 13, 311 P.3d 274. Specifically, "[t]he prosecution may introduce evidence of other acts of the defendant to prove the commission of the offense as charged for any purpose other than propensity," including motive, intent, and identity, and to refute the defense of recent fabrication. § 1610-301(3).
¶ 12 Such evidence is admissible, under a CRE 404(b) analysis, if, as pertinent here, (1) its relevance to a material issue in the case is independent of the intermediate inference that the defendant has a bad character and acted in conformity with that bad character; and (2) its probative value is not substantially outweighed by the danger of unfair prejudice. See People v. Underwood, 53 P.3d 765, 769 (Colo. App. 2002).
A. Acts Involving D.Q.
¶ 13 In our view, the evidence of defendant's prior acts involving D.Q. were "logically relevant" to show material facts independent of the intermediate inference of bad character. Logical relevance requires *671 that "the prior act evidence has any tendency to make the existence of the material fact more or less probable than without the evidence." Yusem v. People, 210 P.3d 458, 464-65 (Colo. 2009). Here, the evidence that defendant had sex with D.Q. at night while she was sleeping had some tendency to make it more probable that (1) defendant had the motive or intent to sexually assault the victim at night while she was sleeping; (2) it was defendant who committed the offense;[1] and (3) the victim did not fabricate the allegation. See People v. Martinez, 36 P.3d 154, 159 (Colo. App. 2001) (The other act evidence was logically relevant because "it had a tendency to make [the] defendant's intent to commit [the charged] crimes and the victim's lack of consent or lack of recent fabrication more probable with the evidence than without it," and the offenses "shared common distinctive characteristics sufficient to allow reasonable jurors to infer that they were committed deliberately.").
¶ 14 As to an assessment of the relative probative value and "unfair" prejudicial effect of the evidence,
• n this context," 'probative value' ... signifies the 'marginal' or 'incremental' ... value of evidence relative to other evidence in the case," People v. Saiz, 32 P.3d 441, 446 (Colo. 2001) (quoting in part Old Chief v. United States, 519 U.S. 172, 185, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) );[2] and
• n "unfair" prejudicial effect signifies " 'an undue tendency to suggest a decision on an improper basis, commonly but not necessarily an emotional one, such as sympathy, hatred, contempt, retribution, or horror.' " Masters v. People, 58 P.3d 979, 1001 (Colo. 2002) (quoting People v. Dist. Court, 785 P.2d 141, 147 (Colo. 1990) ).
¶ 15 On appeal, we must assume the maximum probative value that a reasonable fact finder might give the evidence and the minimum unfair prejudice to be reasonably expected. See People v. James, 117 P.3d 91, 94 (Colo. App. 2004).
¶ 16 In our view, the other act evidence involving D.Q. was probative of defendant's method and intent of seeking sexual gratification from sleeping, isolated individuals. It was also probative to refute defendant's claim that the victim had fabricated the incident. Cf. People v. Rath, 44 P.3d 1033, 1043 (Colo. 2002) ("[W]here disputed testimony of the victim is the only direct evidence of the commission of the guilty act, additional evidence that is probative of that fact may have particular 'marginal' or 'incremental' probative value.").
¶ 17 We acknowledge the potential for "unfair" prejudice created by the admission of this evidence. But the General Assembly has expressly determined that "normally the probative value of [other sexual misconduct] evidence will outweigh any danger of unfair prejudice, even when incidents are remote from one another in time." § 6-10-301(1). Given the significant probative value of this evidence, we cannot conclude that the trial court was compelled to exclude it because its character was such as would cause a jury to overlook its legitimate probative force because of an overmastering hostility toward defendant. See, e.g., People v. Mata, 56 P.3d 1169, 1173-74 (Colo. App. 2002) (probative value of evidence (that the defendant digitally penetrated and fondled his daughter on multiple occasions), which was admitted to show intent and to refute a defense of fabrication by the victim, outweighed danger of unfair prejudice); Martinez, 36 P.3d at 159-60 ("The probative value of [evidence that the defendant admittedly forced two women to have sex with him] in assisting the jury to analyze [the] defendant's state of mind outweighed the danger of unfair prejudice."); People v. Duncan, 33 P.3d 1180, 1183-84 (Colo. App. 2001) (Evidence that the defendant *672 previously took three young men to secluded areas to have sexual contact with them would not "inflame the emotions of the jurors to reach an irrational decision.").
¶ 18 Thus, we perceive no abuse of the court's discretion in admitting the evidence of defendant's acts against D.Q.
B. Acts Involving J.N.
¶ 19 We reach a different conclusion, however, with respect to the evidence concerning defendant's acts against J.N. On appeal, the attorney general asserts that the evidence of these "Peeping Tom"/ indecent exposure incidents was logically relevant for purposes independent of bad character, that is to (1) show that defendant was sexually interested in young girls, see People v. Leonard, 872 P.2d 1325, 1328 (Colo. App. 1993) ("[T]he concept of motive in a sexual assault case may also address other relevant factors such as ... why a particular victim is selected for the assault."); and (2) refute a claim of fabrication on the victim's part.
¶ 20 We find little, if any, logical relevance in the evidence involving J.N. to prove either defendant's motive to have sex with a young girl or that the victim was not lying when she claimed defendant assaulted her. At the time of defendant's acts with respect to J.N., J.N. was fifteen years old and defendant was only twenty or twenty-one years old. In our view, there is a markedly different motivation and perspective underlying a twenty- or twenty-one-year-old male's interest in a fifteen-year-old girl, and a nearly thirty-one-year-old male's interest in a twelve-year-old girl, as was alleged here. Defendant's acts, when he was younger and only five or six years older than J.N., had no tendency to show that he would, as a much older male, be interested in a twelve-year-old girl. Nor, for much the same reason, would such acts tend in any way to refute a defense claim of fabrication by the victim in this case.
¶ 21 Moreover, to the extent that the evidence had any relevance apart from showing bad character, it was so marginal-from an "incrementally" probative perspective-that, in our view, any probative value was necessarily substantially outweighed by the danger of unfair prejudice. Consequently, we conclude that the trial court erred in admitting it.
C. Harmless Error
¶ 22 Under Crim. P. 52(a), we disregard a harmless error. "Because the trial court's error is not one of constitutional dimension, defendant bears the burden of showing prejudice from the error." People v. Casias, 2012 COA 117, ¶ 60, 312 P.3d 208 (citation omitted). To obtain reversal, defendant must establish a reasonable probability that the inadmissible detail contributed to his conviction. See id. at ¶ 62. " 'A reasonable probability' " does not mean that it is " 'more likely than not' " that the error caused the defendant's conviction; rather, it means only a probability sufficient to undermine confidence in the outcome of the case. Id. at ¶ 63 (quoting Krutsinger v. People, 219 P.3d 1054, 1060 n.3 (Colo. 2009) ).
¶ 23 We perceive no such probability here. Although the prosecution referred to defendant's acts involving J.N. in both the opening statement and closing argument, " 'the single most important factor in a nonconstitutional harmless error inquiry is whether the case was close.' " Id. at ¶ 69 (quoting United States v. Ince, 21 F.3d 576, 584 (4th Cir. 1994) ). In this respect, there was a dispute in the evidence about the sleeping arrangements the weekend of the alleged incident. But the jury heard, in addition to the victim's testimony and the testimony of those to whom she reported the offense, recordings of two pretextual telephone calls between defendant and the victim:
• During the first call, the victim told defendant that she was "having problems because of what [he] did to [her]." Defendant responded, "I still apologize to you for that so much." When the victim asked him why he did it, he responded, "I don't know," but then admitted that it might have been because he was drunk.
• During the second call, the victim told defendant, "I'm still upset with what you did to me, like touching me and sticking your fingers in me and stuff." Defendant asked her if she was "ever going to *673 forgive [him] for that ever" and then said, "You don't have to." After a pause, defendant said, "You're not mad at me are you?" and then said, "You can be if you want to be." He also told her, "It's really bothering me."
¶ 24 Indeed, the jury requested, and the court replayed for it, these calls during deliberations. Given the recordings, and the prominence given to them by the jury, we conclude that there was not a reasonable probability that, had the evidence about J.N. been excluded, the outcome of the case would have been different. Consequently, the error was harmless, and reversal is not warranted. See People v. Ramos, 2012 COA 191, ¶ 33, 396 P.3d 21 ("An error will only require reversal where it is shown that but for the error, there was a reasonable probability the outcome would have been different.") (cert. granted on other grounds Feb. 18, 2014).[3]
III. Denial of Probation
¶ 25 Defendant contends that the trial court erroneously sentenced him to imprisonment rather than probation based on his intent to appeal his convictions and invoke his Fifth Amendment right against self-incrimination during sex offender treatment sessions. We disagree.
¶ 26 Both the probation department and a psychosexual evaluator recommended that defendant be sentenced to probation with sex offender treatment. Defense counsel, however, had advised defendant to maintain his privilege against self-incrimination while his case was pending on direct appeal, a circumstance, which, according to the prosecution's evidence, would thwart an important part of defendant's sex offender treatment (that is, that the offender admit responsibility for his misconduct).
¶ 27 In deciding whether to grant defendant probation or sentence him to prison, the court said, "[t]o a great extent, it comes down to the question of [his] participation in treatment." Elaborating further, the court noted:
If I sentence the defendant to probation, and he continues to exercise his Fifth Amendment rights because he has an appeal, he's effectively not in treatment. And more than effectively not in treatment, ... but the rules of the Sex Offender Management Board would require that they terminate his treatment....
Now that means he can be supervised I suppose, but not treated.... Effectively he gets back on some form of probation for other than sex offenders. I think it does increase the risk to the community for an offender not to be in treatment and yet still placed in the community....
I think it would be an exercise in futility to grant probation just so that we can flunk him out of treatment and therefore [cause him to] flunk out of probation and therefore go to prison anyway....
But beyond that, I think there is an increased risk. If somebody's not actively participating in treatment, there's an increased risk to the community....
I do also have to look at the nature of the offense, and it certainly justifies a prison sentence, although perhaps not requiring it.
¶ 28 The court then sentenced defendant to a term of imprisonment.
¶ 29 Whether to grant or deny probation is ordinarily a decision committed to the discretion of the sentencing court. See People v. Guatney, 214 P.3d 1049, 1052 (Colo. 2009) ; People v. Nance, 221 P.3d 428, 433 (Colo. App. 2009). Although the grant or denial of probation is ordinarily not subject to appeal, defendant's contention that the court denied probation on an unconstitutional basis is properly before us. See generally People v. Hernandez-Clavel, 186 P.3d 96, 98-100 (Colo. App. 2008) (reviewing contention that, in denying probation, the court improperly considered the defendant's status as an illegal alien subject to deportation).
*674 ¶ 30 "[A] State may not impose substantial penalties because a [person] elects to exercise his Fifth Amendment right not to give incriminating testimony against himself." Lefkowitz v. Cunningham, 431 U.S. 801, 805, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977) ; see also Malloy v. Hogan, 378 U.S. 1, 8, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) ("[T]he Fifth Amendment guarantees ... the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty ... for such silence.").
¶ 31 In People v. Ruch, 2013 COA 96, 374 P.3d 485, a division of this court reaffirmed the holding of a prior division to the effect that " 'absent a grant of use immunity, the state may not revoke a defendant's probation based on the assertion of his or her Fifth Amendment right against self-incrimination and the consequent refusal to admit guilt to the offense for which he was on probation while the direct appeal is pending.' " Id. at ¶¶ 61, 63 (quoting People v. Guatney, 183 P.3d 620, 626 (Colo. App. 2007), vacated on other grounds, 214 P.3d 1049 (Colo. 2009) ) (cert. granted June 30, 2014).
¶ 32 Defendant seeks to extend Ruch and Guatney by arguing that, if a state cannot revoke probation based on an offender's legitimate exercise of the privilege against self-incrimination, it cannot deny probation on that ground, either. We are not persuaded.
¶ 33 We need not revisit the merits of Ruch and Guatney. Even assuming their validity, defendant would not be entitled to relief. This follows because a person who is applying for probation is in a different situation from a person who has been sentenced to probation. In the latter instance, the person has attained a "liberty interest," which may not be taken away from him in the absence of due process. See, e.g., People v. Calderon, 2014 COA 144, 356 P.3d 993. In the instance of an applicant for probation, however, the person has no such interest. See People v. Noel, 134 P.3d 484, 486 (Colo. App. 2005) ("Probation is a privilege, not a right."); see also People v. Smith, 2014 CO 10, ¶ 8, 318 P.3d 472 ("Because probation is an opportunity for an offender to avoid serving a harsher sentence, an offender must apply for it, and receipt of probation is characterized as a privilege, not a right.").
¶ 34 In determining whether to grant probation, a court may consider, among other things, the "risk that during a period of probation the defendant will commit another crime," and whether the defendant would be "particularly likely to respond affirmatively to probationary treatment." § 18-1.3-203(1)(a), (2)(j), C.R.S. 2014.
¶ 35 In Dzul v. State, 118 Nev. 681, 56 P.3d 875 (2002), the supreme court of Nevada addressed the defendant's contention that "conditioning probation upon a favorable psychosexual evaluation creates a classic penalty situation because defendants who invoke their Fifth Amendment rights in the clinical interviews cannot receive a favorable evaluation. They are then 'punished' by sentences of mandatory imprisonment." Id. at 881. The court (1) analyzed McKune v. Lile, 536 U.S. 24, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002), where the United States Supreme Court upheld a state's reduction of privileges to prison inmates who refused to participate in sex offender treatment programs by admitting their guilt;[4] and (2) ultimately decided the case based on the distinction between a penalty imposed and a benefit denied:
[P]robation is a form of leniency and ... Dzul was not penalized in this case for refusing to admit guilt to the underlying offense during his psychosexual evaluations. Instead, he was not given a benefit that may be extended to defendants who accept responsibility for their wrongs. Probation has been regarded traditionally as a form of leniency. Moreover, "[t]he Fifth Amendment does not insulate a defendant from all 'difficult choices' that are presented during the course of criminal proceedings, or even from all choices that burden the exercise or encourage waiver of the Fifth Amendment's right against self- *675 incrimination." Further, presenting a defendant with the choice between admitting responsibility with a greater chance of receiving a favorable psychosexual evaluation or denying responsibility with a greater risk of receiving an unfavorable evaluation is consistent with the historical practice and understanding that a sentence imposed upon a defendant may be shorter if rehabilitation looks more certain and that confession and contrition are the first steps along the road to rehabilitation. Rehabilitation is a key factor in extending leniency to convicted offenders.
Dzul , 56 P.3d at 883 (footnotes omitted) (quoting United States v. Frazier , 971 F.2d 1076, 1080 (4th Cir. 1992) ).
¶ 36 Other courts have reached the same result, using similar reasoning. See State v. Hernandez, 231 Ariz. 353, 295 P.3d 451, 454 (Ariz. Ct. App. 2013) (agreeing "with those jurisdictions that have concluded the Fifth Amendment does not preclude a sentencing court from considering a defendant's refusal to answer questions about the offense in determining whether he or she is a suitable candidate for probation"); State v. Sosa, 122 N.M. 446, 926 P.2d 299, 301 (1996) (denial of probation based on the defendant's failure to cooperate by naming his drug source did not violate Fifth Amendment; "[W]e cannot see how failure to suspend a statutorily-prescribed sentence can ever be characterized as anything other than a refusal to grant leniency." (internal quotation marks omitted)); State v. Souder, 105 S.W.3d 602, 608 (Tenn. Crim. App. 2002) (consideration of the defendant's silence in the context of determining whether he was a suitable candidate for probation did not violate Fifth Amendment); State v. Pritchett, 69 P.3d 1278, 1285-87 (Utah 2003) (holding that Utah statute, which limited probation and residential treatment to sex offenders who admit offense of conviction, did not violate Fifth Amendment; statute "grants a privilege to which the convicted child sex offender has no automatic right-placement in a resident treatment facility-in exchange for the offender choosing to admit culpability"); cf. Doe v. Sauer, 186 F.3d 903, 906 (8th Cir. 1999) (denial of parole for prisoner's refusal to participate in rehabilitation by admitting guilt did not violate Fifth Amendment).
¶ 37 Agreeing with the reasoning of these courts, we conclude that the trial court did not impermissibly infringe upon defendant's Fifth Amendment rights when it denied him the privilege of probation based, in part, on the prospect that he would not, during the pendency of this appeal and in the course of sex offender treatment, admit responsibility for his crime. The trial court's findings show that it properly considered the risk to the community, whether defendant could successfully complete sex offender treatment, and the nature of the offense.
¶ 38 We perceive no reason to disturb the court's sentence.
IV. Constitutionality of SOLSA
¶ 39 Finally, defendant argues that the Colorado Sex Offender Lifetime Supervision Act of 1998 (SOLSA) is unconstitutional on its face and as applied to him. He contends that SOLSA violates procedural and substantive due process, equal protection, the separation of powers doctrine, the prohibition against cruel and unusual punishment, and the privilege against self-incrimination.
¶ 40 Because he did not present this argument to the trial court, defendant did not preserve the issue for appellate review. See People v. Martinez, 634 P.2d 26, 32 (Colo. 1981) (an issue regarding the constitutionality of a statute must be presented to the trial court to properly preserve it for appellate review). Therefore, we do not address defendant's argument because he raised the constitutionality of the statute for the first time on appeal. See People v. Cagle, 751 P.2d 614, 619 (Colo. 1988) ; People v. Brown, 70 P.3d 489, 494 (Colo. App. 2002).
¶ 41 The judgments and sentences are affirmed.
JUDGE BERGER and JUDGE MÁRQUEZ* concur.

We reject defendant's argument that his identity was not at issue during the trial. The prosecution was required to prove that defendant was the one who committed the offenses. See §§ 18-3405(1), 18-3-405.3(1), (2)(a), C.R.S. 2014.

In determining "incremental" probative value, the court weighs " 'the logical force of the evidence and the proponent's need for the evidence,' in light of other available evidence." People v. Rath, 44 P.3d 1033, 1041 (Colo. 2002) (quoting Martin v. People, 738 P.2d 789, 794 (Colo. 1987) ).

In reaching this conclusion, we necessarily reject defendant's argument on appeal that the pretextual calls were difficult to hear and left much to speculation and interpretation. Our review of the record shows that, although quiet, the victim's and defendant's statements were readily discernible.

Inmates who refused to so participate would have certain privileges reduced, including visitation rights, earnings, work opportunities, ability to send money to family, canteen expenditures, and access to personal televisions. See McKune v. Lile, 536 U.S. 24, 30-31, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002).

Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5 (3), and § 24-51-1105, C.R.S. 2014.