COLORADO COURT OF APPEALS                                    2017COA63

Court of Appeals No. 14CA1331
City and County of Denver District Court No. 13CR1748
Honorable Martin F. Egelhoff, Judge
Honorable John W. Madden, IV, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Leroy Salas,

Defendant-Appellant.

JUDGMENT AFFIRMED IN PART, VACATED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division I
Opinion by JUDGE TAUBMAN
Graham and Navarro, JJ., concur

Announced May 18, 2017

Cynthia H. Coffman, Attorney General, Brian M. Lanni, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Douglas K. Wilson, Colorado State Public Defender, Katherine Brien, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Leroy Salas, appeals his judgment of conviction and sentence entered on jury verdicts finding him guilty of sexual assault on a child by one in a position of trust and sexual assault on a child, pattern of abuse. Salas also appeals the trial court's order finding him to be a sexually violent predator (SVP). We affirm in part, vacate in part, and remand for findings.

## I.     Background

¶ 2     The victim was nine years old when her mother began dating Salas in August 2011. At the time, the victim lived with her mother in Loveland. In September 2011, the three moved in with the victim's grandmother, at her apartment in Denver. In November 2011, Salas and mother moved into a separate apartment together in Denver, but the victim continued to live with grandmother. The victim occasionally visited her mother's apartment.

¶ 3     At trial, the victim testified that, during visits, she would sometimes be alone with Salas in the apartment while mother worked. She testified that on occasion, Salas told the victim to lie down on his bed and touched her "stomach and legs" and her "private parts" over her clothing. The prosecutor asked the victim to indicate on a diagram where Salas touched her, and she

1

indicated the buttocks. On another occasion, Salas made the victim touch his penis. The victim did not tell anyone about these incidents because Salas told her not to, and she was scared.

¶ 4    In early 2012, mother and Salas broke up, and mother moved to California; the victim followed once she finished school in Denver. There, the victim told a family friend about the assaults. The friend relayed the information to mother and mother called the police. The victim spoke about the incidents with a sheriff and a counselor in California.

¶ 5    In November 2012, the victim moved back in with grandmother in Denver. The victim discussed the assaults with a forensic interviewer at the Denver Children's Advocacy Center.

¶ 6    At trial, the theory of defense was that the victim fabricated the assaults in order to gain attention, and that Salas could not have sexually assaulted her because he was never alone with her for a sufficient period.

## II.    Mistrial

¶ 7    Salas first contends that the trial court abused its discretion and violated his rights to due process, a fair trial, and an impartial jury by denying his motion for a mistrial after grandmother testified

that Salas had "some type of court proceedings on an alcohol problem," a nonresponsive answer to a question which, he says, impermissibly referred to prior criminality. We disagree.

¶ 8    Grandmother testified that mother and Salas lived with her for a few months before they moved into their own apartment. The court asked grandmother a question posed by the jury: "Was Salas employed during the two- to three-month period and if so how many hours per week?" Grandmother replied that he was employed. Defense counsel questioned grandmother further on whether Salas was employed full-time, to which grandmother responded, "He had — no — how can I say this except to be honest. There was some type of court proceedings on an alcohol problem." Defense counsel moved for a mistrial. The trial court denied the motion and instructed the jury to disregard grandmother's response.

### A.    Standard of Review

¶ 9    A trial court has broad discretion to grant or deny a mistrial, and its decision will not be disturbed on appeal absent an abuse of discretion and prejudice to the defendant. *People v. Santana*, 255 P.3d 1126 (Colo. 2011); *People v. Abbott*, 690 P.2d 1263, 1269

(Colo. 1984). A court abuses its discretion only when inadmissible evidence is likely to have substantially prejudiced the jurors despite the use of any alternative remedies. *People v. Lahr*, 2013 COA 57, ¶ 23, 316 P.3d 74, 79. A mistrial is "the most drastic of remedies," and is "only warranted where the prejudice to the accused is too substantial to be remedied by other means." *Abbott*, 690 P.2d at 1269.

¶ 10    Relying on *Santana* and *People v. Chastain*, 733 P.2d 1206 (Colo. 1987), Salas asserts that he has presented a constitutional claim because grandmother's statement violated his rights to due process and a fair trial by an impartial jury. However, neither of these cases involved a motion for a mistrial based on a reference to prior criminality. Further, an erroneous reference to a defendant's prior criminality is not an error of constitutional dimension, and we therefore review such claims for nonconstitutional harmless error. *See, e.g., People v. Pernell*, 2014 COA 157, ¶¶ 26, 42-52, __ P.3d __, __, __; *Lahr*, ¶ 23, 316 P.3d at 79; *see also People v. Yusem*, 210 P.3d 458, 469 n.16 (Colo. 2009) (erroneous admission of prior bad act evidence is not error of constitutional dimension). Therefore, we review Salas' claim for nonconstitutional harmless error.

## B.    Applicable Law

¶ 11    Salas relies on *Goldsberry* to assert that "[i]n a criminal trial to a jury, evidence of a defendant's criminal activity, which is unrelated to the offense charged, is inadmissible." *People v. Goldsberry*, 181 Colo. 406, 409, 509 P.2d 801, 803 (1973). However, *Goldsberry* also notes that "exceptions to this rule are limited to well defined and special situations where proof of similar offenses will show the defendant's intent, motive, plan, scheme, or design with respect to the crime charged." *Id.* The supreme court in *Goldsberry* held that in such situations, the court is required to give instructions limiting the purpose of such evidence, *id.*, and that when reference is made in the presence of the jury to a defendant's unrelated criminal activity, "a mistrial is normally required," *id.*

¶ 12    However, subsequent cases have limited the holding in *Goldsberry*: "[A]n ambiguous reference to evidence of a defendant's criminality does not necessitate a new trial." *Lahr*, ¶ 24, 316 P.3d at 79 (citations omitted); *see also People v. Vigil*, 718 P.2d 496, 505-06 (Colo. 1986) (police officer's reference to contraband found in defendant's home did not warrant mistrial). In addition, fleeting references to a defendant's alleged criminal history have even less

5

prejudicial impact.  *Lahr*, ¶ 24, 316 P.3d at 79-80; *see also Abbott*, 690 P.2d at 1269 (A mistrial was unwarranted in part because "the reference to past criminal acts was a single unelicited remark."). The circumstances of each case must be reviewed to determine whether the defendant was prejudiced.  *Abbott*, 690 P.2d at 1269; *People v. Moore*, 226 P.3d 1076, 1087-88 (Colo. App. 2009).

¶ 13    Further, *Goldsberry* was announced prior to the promulgation of the Colorado Rules of Evidence.  While the rules state that evidence of other crimes, wrongs, or acts is not admissible to prove the defendant's character in order to show that he or she acted in conformity therewith, *see* CRE 404(b); *Kaufman v. People*, 202 P.3d 542, 552 (Colo. 2009), such evidence can be admissible for the same purposes and under the same conditions enumerated in *Goldsberry, see Kaufman*, 202 P.3d at 552 (citing CRE 404(b)); *People v. Beasley*, 43 Colo. App. 488, 492, 608 P.2d 835, 838 (1979) (citing *Goldsberry* and CRE 404(b)).

¶ 14    Generally, the erroneous admission of evidence is remedied by instructing the jurors to disregard it.  *Vigil v. People*, 731 P.2d 713, 716 (Colo. 1987); *Lahr*, ¶ 25, 316 P.3d at 80.  Absent evidence to the contrary, we presume jurors follow such an instruction.  *Lahr*,

6

¶ 25, 316 P.3d at 80.  The supreme court noted in *Goldsberry* that where the prosecution has intentionally elicited the prejudicial information, evidence of a defendant's guilt is "thin," and if the proof of at least one of the essential elements of the crime charged is entirely circumstantial, a trial court's cautionary instruction will not suffice.  *Goldsberry*, 181 Colo. at 409, 509 P.2d at 803.  However, the supreme court has since clarified that "[t]he circumstances are . . . rare where we . . . will depart from the presumption that a jury follows a court's curative instructions."  *Qwest Servs. Corp. v. Blood*, 252 P.3d 1071, 1091 (Colo. 2011); *see also People v. Ellis*, 30 P.3d 774, 778 (Colo. App. 2001) (acknowledging *Goldsberry* but concluding that court's instruction was sufficient to cure prejudice); *People v. Gillispie*, 767 P.2d 778, 780 (Colo. App. 1988) ("[A]n instruction is inadequate only when evidence is so prejudicial that, but for its exposure, the jury might not have found the defendant guilty.").

C.    Analysis

¶ 15    Here, grandmother's comment regarding "court proceedings on an alcohol problem" referred ambiguously to possible past criminality.  It was a single, fleeting, nonresponsive comment.  It

7

did not necessarily reference any criminal behavior on the part of Salas, since "court proceedings" on an "alcohol problem" could also refer to civil and administrative proceedings involving alcohol consumption. *See, e.g.*, § 27-81-112, C.R.S. 2016 (governing involuntary civil commitment of alcoholics); § 42-2-126, C.R.S. 2016 (governing license revocation proceedings based on an administrative determination).

¶ 16    The possibility that a reasonable juror inferred Salas' guilt based on grandmother's reference to an "alcohol problem" is highly attenuated. If such a comment had an impact on the jury, it was not "so prejudicial that, but for its exposure, the jury might not have found against the defendant." *People v. McNeely*, 68 P.3d 540, 542 (Colo. App. 2002) (citation omitted); *see also People v. Ned*, 923 P.2d 271, 275 (Colo. App. 1996) ("Speculation of prejudice is insufficient to warrant reversal of a trial court's denial of a motion for mistrial.").

¶ 17    Further, the trial court immediately instructed the jurors to disregard grandmother's comment, and, absent exceptional circumstances where the evidence against Salas is thin, we presume that the jury followed such an instruction. This is

particularly the case here because, unlike in *Goldsberry*, the remark was not intentionally elicited to prejudice Salas. *See Goldsberry*, 181 Colo. at 409, 509 P.2d at 803. Rather, the counsel for the defense elicited this information when she pressed grandmother further on whether Salas was employed full time.

¶ 18 Because grandmother's remark was fleeting, minimally prejudicial, and immediately followed by a curative instruction, we conclude that the trial court did not abuse its discretion when it denied Salas' motion for a mistrial.

### III. Grandmother's Interview Video

¶ 19 Salas next contends that the district court abused its discretion when it denied his request to play a videotaped interview of grandmother after concluding that she had not denied anything that would be subject to impeachment through a collateral source. We disagree.

¶ 20 After the victim told a family friend in California about Salas' actions in August 2012, a San Bernardino sheriff contacted grandmother to talk about the sexual assault allegations. Grandmother told the sheriff that she knew of "one or two — possibly two occasions" that Salas had been alone with the victim.

Grandmother told the sheriff that the victim lived with her "99 percent of the time."

¶ 21    In October 2013, Detective Nash Gurule of the Denver Police Department interviewed grandmother. During the recorded interview, grandmother relayed information about the sexual assaults that she had learned from the victim, specifically: (1) "[mother] told me that . . . Salas would have [the victim] grab him"; (2) "according to [mother], [the victim] said she never let him touch her uh, without any clothes on"; and (3) mother told grandmother that the victim had touched Salas while he did not have clothes on, but that the victim had never taken her clothes off.

¶ 22    Detective Gurule also asked grandmother how long Salas and mother had lived together in their Denver apartment. Grandmother explained that they lived there "maybe November of 2011 into like maybe January, February 2012. Right around that time . . . I know Christmas for sure of 2011. . . ." The detective then asked her, "[D]uring that time, how long do you think you had [the victim] at your house?" Grandmother misunderstood and replied, "[H]ow long did [the victim] stay there? Maybe, maybe a half a dozen times. . . ." The detective asked: "Stayed with you or stayed there?"

10

Grandmother clarified and reiterated that the victim stayed at mother's and Salas' apartment "[m]aybe a half a dozen times" but did not identify any specific dates, nor did the detective ask for any.

¶ 23 At trial, grandmother testified that Salas, mother, and the victim lived with her in Denver from about September to November 2011 until Salas and mother moved into their own apartment. The victim continued to live with grandmother because she was attending a school near grandmother's house, but would occasionally visit and spend the night with mother and Salas on the weekends. Grandmother testified that one such occasion was during Christmas vacation. Grandmother testified that "once or twice Salas came himself to take [the victim] over there because [mother] was working and he would be watching her. The other times [mother] would come or maybe [mother] and Salas would come. It is a short period of time just to pinpoint those days."

¶ 24 During cross-examination, defense counsel asked grandmother if she had spoken to the San Bernardino sheriff, mother, and Detective Gurule about the allegations, and grandmother answered affirmatively. Defense counsel asked if she had testified previously, and grandmother again affirmed. Defense

counsel also asked if she had spoken with mother about the allegations on "numerous occasions," and grandmother denied that she had spoken in detail with mother. Defense counsel then confronted grandmother with the statements she had made to Detective Gurule in which she relayed information she had learned from mother. Grandmother admitted to making each statement. Defense counsel then asked grandmother, "And nowhere in this interview do you say anything about [the victim] spending time with [mother] and Salas over Christmas vacation?" Grandmother agreed and explained that Detective Gurule did not ask her that question. Defense counsel later asked grandmother if she did not mention Christmas to the detective because of a lack of recollection. Grandmother reiterated that she did not mention it because she was "never asked the question."

¶ 25    During redirect examination, the prosecutor asked grandmother if she had spoken to mother "in detail" about the sexual assaults, and grandmother denied doing so.

¶ 26    During recross-examination, defense counsel again questioned grandmother about the "details" she had learned from mother. Grandmother reiterated that she had heard things from mother, but

12

had no knowledge of certain details.  Defense counsel then confronted grandmother again with her statements to Detective Gurule in which she relayed information she had learned from mother.  Grandmother again agreed that she had made the statements.  Counsel asked grandmother if those were "details." Grandmother agreed that they were.

¶ 27    The next day, defense counsel sought to admit and publish the interview between grandmother and Detective Gurule.  The prosecutor objected, arguing that the video was not admissible under section 16-10-201, C.R.S. 2016, because grandmother had not denied at trial that she had made any inconsistent statements in the interview.  Defense counsel argued that (1) grandmother's testimony was "all over the board"; (2) she had been inconsistent regarding whether she had given details to the detective; and (3) she had made it sound as though she did not give certain evidence to the detective because he had not asked her for it, while "the whole flavor of that interview" demonstrated that the detective did not ask many questions because grandmother was extremely talkative and forthcoming, even volunteering information that the detective had

13

not asked about.  Defense counsel also argued that any irrelevant and prejudicial information on the video could easily be cut.

¶ 28      The court denied defense counsel's request to play the videotape, concluding that grandmother had not denied anything that would be subject to impeachment through the videotape:

> Okay.  Well, I was taking pretty careful — I paid pretty close attention to [grandmother's] testimony, and I was trying to take some notes with respect to those areas in which she was impeached, and she didn't deny anything.  She didn't claim lack of memory of anything.  When she was confronted with the transcripts of things to impeach her, she agreed with what was in the transcripts.  So, I don't find that there's anything more, or I don't think there's anything that she denied which would be subject to . . . impeachment through the collateral source or the source of the tape, which is — so, I just don't find that, especially that the evidence is sufficiently impeaching as to the specific testimony that she gave here in court.  So, I don't feel this is admissible.  So, I am going to deny the request, or refuse the evidence.

### A.    Standard of Review

¶ 29      The People assert that Salas has not properly preserved this issue for review because defense counsel did not identify whether his request to admit the video fell under CRE 613 or section 16-10-201.  We conclude that even though defense counsel did not

14

cite either the rule or the statute in court, he preserved such claims for appeal because his arguments for submitting the video into evidence identified the subject matter of both the rule and the statute, and the trial prosecutor identified the statute on which Salas relies on appeal. We conclude that these circumstances were sufficient to preserve his claim. *See People v. Melendez*, 102 P.3d 315, 322 (Colo. 2004) ("We do not require that parties use 'talismanic language' to preserve particular arguments for appeal, but the trial court must be presented with an adequate opportunity to make findings of fact and conclusions of law on any issue before we will review it." (quoting *People v. Syrie*, 101 P.3d 219, 223 n.7 (Colo. 2004))); *see also Martinez v. People*, 2015 CO 16, ¶ 14, 344 P.3d 862, 868 ("An adequate objection allows the trial court a meaningful chance to prevent or correct the error and creates a record for appellate review." (citing *Melendez*, 102 P.3d at 322)).

¶ 30 Accordingly, we review the trial court's decision to exclude the evidence for an abuse of discretion. *People v. Welsh*, 80 P.3d 296, 304 (Colo. 2003). However, a trial court's interpretation of a statute or rule governing the admissibility of evidence is reviewed de novo. *People v. Hill*, 228 P.3d 171, 173 (Colo. App. 2009). A court abuses

15

its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or when it misconstrues the law. *People v. Acosta*, 2014 COA 82, ¶ 75, 338 P.3d 472, 485.

¶ 31    A court's erroneous exclusion of a witness' prior inconsistent statements is reviewed for nonconstitutional harmless error. *People v. Komar*, 2015 COA 171M, ¶ 55, __ P.3d __, __ (citing *Hagos v. People*, 2012 CO 63, ¶ 12, 288 P.3d 116, 119). Reversal is warranted only where the error "substantially influenced the verdict or affected the fairness of the trial proceedings." *Id.* (citation omitted).

¶ 32    The People contend that it is unclear which alleged inconsistencies Salas relies on in his claim of error, arguing that Salas only broadly contends that grandmother "made statements at trial that were not consistent with prior statements she made to Detective Gurule, including statements regarding how often the victim spent time at her mother and Salas' apartment." Salas also references testimony related to grandmother's conversation with a San Bernardino sheriff earlier in the year. To the extent Salas argues inconsistencies that were never raised in the trial court, we review them only for plain error. *Melendez*, 102 P.3d at 322; *see*

*also People v. Ujaama,* 2012 COA 36, ¶ 37, 302 P.3d 296, 304 (An issue is unpreserved for review when an objection is made "on unspecific grounds which would not have alerted the trial court to the issue of which the defendant now seeks review.").  Plain error must be both "obvious and substantial," and must have "so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction." *People v. Miller,* 113 P.3d 743, 750 (Colo. 2005) (citations omitted).

### B.    Applicable Law

¶ 33    The use of prior inconsistent statements in criminal trials is expressly governed by both statute and rule.  *People v. Saiz,* 32 P.3d 441, 445 (Colo. 2001); *see also Montoya v. People,* 740 P.2d 992, 995-96 (Colo. 1987).

> CRE 613 comports generally with prior case law by prohibiting examination of a witness for impeachment by prior inconsistent statement until his attention has been called to the time, place, and circumstances of the prior statement and by barring the admission of extrinsic evidence to prove any prior statement that is conceded by the witness.

*Saiz,* 32 P.3d at 445; *see also Montoya,* 740 P.2d at 995-96.  In contrast, section 16-10-201 creates "a new rule of substantive

evidence" for criminal cases by "eliminating the hearsay impediment to using prior inconsistent statements for the purpose of establishing a fact to which witness' testimony and prior statement relate, as long as the witness is still available and his prior statement relates to a matter within his own knowledge." *Saiz*, 32 P.3d at 445; *see also Montoya*, 740 P.2d at 997-98. The statute "allows a prior inconsistent statement to be used as substantive evidence of the fact to which the statement relates," and it "does not include the foundation requirement that a witness must have denied or failed to remember the prior statement before it can be proved by extrinsic evidence." *Montoya*, 740 P.2d at 996. The statute provides:

> (1) Where a witness in a criminal trial has made a previous statement inconsistent with his [or her] testimony at the trial, the previous inconsistent statement may be shown by any otherwise competent evidence and is admissible not only for the purpose of impeaching the testimony of the witness, but also for the purpose of establishing a fact to which his [or her] testimony and the inconsistent statement relate, if:
> (a) The witness, while testifying, was given an opportunity to explain or deny the statement or the witness is still available to give further testimony in the trial; and

> (b) The previous inconsistent statement purports to relate to a matter within the witness's own knowledge.

§ 16-10-201. While section 16-10-201 also relaxes the foundational requirements for impeachment by prior inconsistent statement in some respects, CRE 613 does not conflict with the statute and continues to apply in civil cases and in criminal cases in which the foundational requirements of the statute are not met. *Saiz*, 32 P.3d at 445; *see also Montoya*, 740 P.2d at 997-98.

¶ 34    In *Saiz*, the supreme court addressed the admissibility of a videotaped interview containing prior inconsistent statements under the statute. It held that the trial court did not abuse its discretion in excluding a videotape of the defendant's minor son which contained inconsistent statements. This was because, even though the video evidence demonstrated inconsistent statements, "the defense was in no way limited from introducing extrinsic evidence of those statements." *Saiz*, 32 P.3d at 447. This was particularly so because the son contradicted himself during trial. Further, the video was offered solely to impeach the witness; there was no contention that the video would be any different from the testimony already offered to impeach the witness. "Without offering the

videotape for any purpose other than to impeach [the witness']

testimony . . . the defendant's counsel asserted that this additional

extrinsic evidence was admissible simply because it was a videotape

of [the witness'] own words." *Id.* The supreme court concluded:

> In light of the other evidence already admitted
> and the offer of proof before it, the trial court's
> ruling amounted to little more than a
> determination that under the circumstances of
> this case the defendant was not entitled to
> introduce a videotape to show the same
> statements that it had already shown by
> uncontested testimony.

*Id.* at 449.

## C.    Analysis

¶ 35     Both parties concede that the video is not admissible under

CRE 613. Salas did not argue specifically that the video was

admissible under section 16-10-201 at trial, but asserts on appeal

that the district court misapplied section 16-10-201 in excluding

the tape because he was not required to confront grandmother with

her inconsistent testimony in order for it to be admissible.

¶ 36     Here, as in *Saiz*, the district court did not abuse its discretion

in excluding the videotaped interview of grandmother after defense

counsel sufficiently confronted grandmother with her inconsistent statements and she either explained or conceded them.

¶ 37 The district court denied defense counsel's request to play the tendered videotape after concluding that grandmother had not denied anything that would be subject to impeachment. During grandmother's trial testimony, defense counsel presented direct quotes of her inconsistent statements from her videotaped interview, and she conceded those inconsistencies. The statements that she did not concede related to the amount of time that the victim had spent with her, which she sought to explain. Defense counsel argued that the videotape was admissible because the applicable foundational requirements were met, the videotaped interview demonstrated that grandmother was "talkative," and the jurors needed the overall "flavor" of the interview to assess grandmother's testimony.

¶ 38 Defense counsel thoroughly impeached grandmother during cross-examination and, in offering the videotaped interview, did not assert that anything in it would differ from grandmother's cross-examination testimony. *See id.* at 450. Further, "[t]he jury was not shielded in any way from [the witness'] apparent

21

contradictions but was able to observe, first hand, the nuances in questioning that led to his different responses." *Id.* Thus, the trial court did not abuse its discretion in excluding the videotape because Salas' offered purpose had already been accomplished by his cross-examination of grandmother. To the extent there were any inconsistencies between the interview and grandmother's trial testimony, grandmother admitted them. Thus, admission of the video would have been cumulative. The trial court could have properly excluded the video on that basis alone. *See* CRE 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."); *see also Saiz,* 32 P.3d at 445-49.

¶ 39    Accordingly, we conclude that the district court did not abuse its discretion in refusing to admit the videotape.

## IV.    SVP Designation

¶ 40    Last, Salas contends that the trial court's determination that he qualified as an SVP failed to satisfy statutory and due process requirements because the court never made specific findings of fact

22

in support of its determination as required by section 18-3-414.5(2), C.R.S. 2016. We agree that the court's analysis did not satisfy the statute and related case law.

¶ 41 Prior to Salas' sentencing, a probation officer completed a Colorado Sexually Violent Predator Assessment Screening Instrument (SVPASI), as required by section 18-3-414.5. The probation officer found that Salas satisfied the criteria for SVP designation, in part because he promoted a relationship with the victim primarily for the purpose of sexual victimization. The SVPASI was provided to the court at sentencing along with a presentence investigation report (PSI) summarizing the facts and background of the case. At sentencing, the prosecutor asked "that the Court find that Salas is a sexually violent predator per the assessment." After imposing a sentence, the trial court stated, "Oh, and also based upon the [SVPASI] report, Salas meets the criteria of a sexually violent predator."

### A. Review of SVP Designation on Appeal

¶ 42 Initially, the People contend that because an SVP designation is a civil matter and because Salas did not object to the SVP designation in the trial court and preserve the issue for appeal, we

should not review this claim of error. *See Estate of Stevenson v. Hollywood Bar & Cafe, Inc.*, 832 P.2d 718, 721 n.5 (Colo. 1992) ("Arguments never presented to, considered or ruled upon by a trial court may not be raised for the first time on appeal."). However, we disagree.

¶ 43 The People assert that "though the SVP statute is housed in the criminal code, the designation is met with a civil burden of proof." *People v. Allen*, 2013 CO 44, ¶ 7, 307 P.3d 1102, 1105. *Cf. People v. Daly*, 313 P.3d 571 (Colo. App. 2011) (restitution is a civil judgment independent of a defendant's conviction). As a result, they argue, an SVP designation is not part of a criminal proceeding and it is not a punishment. Therefore, "a trial court's decision to designate an offender as an SVP is legally and practically distinct from its sentencing function." *Allen*, ¶ 7, 307 P.3d at 1105; *see also People v. Stead*, 66 P.3d 117, 123 (Colo. App. 2002), *overruled by Candelaria v. People on other grounds*, 2013 CO 47, 303 P.3d 1202. However, the *Allen* court did not suggest that an SVP designation imposed in a criminal case pursuant to a criminal statute is not part of a criminal proceeding subject to direct appeal in a criminal case. It only concluded that appellate courts must defer to a trial

court's factual SVP findings when they are supported by the record and review de novo the trial court's legal conclusions regarding whether an offender should be designated as an SVP. *Allen,* ¶ 4, 307 P.3d at 1105.

¶ 44    Before *Allen,* multiple divisions of this court held that when a defendant fails to object to a lack of specific findings on an SVP designation, we review for plain error. *See, e.g., People v. Mendoza,* 313 P.3d 637, 641 n.4 (Colo. App. 2011); *People v. Loyas,* 259 P.3d 505, 511 (Colo. App. 2010); *People v. Buerge,* 240 P.3d 363, 369 (Colo. App. 2009). However, since *Allen* established that an SVP designation carries a civil burden of proof, no court has addressed the People's contention that we may not review an SVP designation when a defendant has not preserved the issue for appeal.

¶ 45    We conclude that although the SVP designation is not a criminal punishment, it is only imposed in conjunction with a criminal conviction and thus should not be separated from the appeal of criminal trial issues. This is particularly so because an SVP designation only accompanies a conviction of a sexual offense. *See* § 18-3-414.5(2) (When an offender has been convicted of a sexual offense listed in this section, "the court shall make specific

findings of fact and enter an order concerning whether the defendant is a sexually violent predator" based on the SVPASI.).

¶ 46 Considering the logic above and the holdings of various divisions of this court prior to the decision in *Allen*, we reject the People's contention that we should not review Salas' unpreserved challenge to his SVP designation, and therefore review the merits of his claim for plain error, following the pre-*Allen* decisions by divisions of this court noted above. *See, e.g.*, *Mendoza*, 313 P.3d at 641 n.4.

## B. Standard of Review

¶ 47 A trial court's SVP designation involves a mixed question of law and fact. *Allen*, ¶ 4, 307 P.3d at 1105. We must defer to a trial court's factual findings if they are supported by the record, but review any legal conclusions de novo. *Id.*

## C. Applicable Law

¶ 48 A trial court shall designate an offender an SVP when the offender: (1) was eighteen years of age or older as of the date of the offense; (2) was convicted of an enumerated sexual offense; (3) committed the offense against a victim who was a stranger or was a person with whom the offender established or promoted a

relationship primarily for the purpose of sexual victimization; and (4) is likely to recidivate. § 18-3-414.5(1)(a)(I)-(IV); *Allen*, ¶ 6, 307 P.3d at 1105.

¶ 49 When a defendant is convicted of an enumerated offense, the probation department completes an SVP assessment. § 18-3-414.5(2). "Based on the results of the assessment, the court shall make specific findings of fact and enter an order concerning whether the defendant is a sexually violent predator." *Id.*

¶ 50 The trial court is ultimately responsible for determining whether a defendant satisfies the four elements of the SVP statute. *Uribe-Sanchez v. People*, 2013 CO 46, ¶ 8, 307 P.3d 1090, 1091-92. "In making this ultimate determination, the trial court relies on both the statute itself, and on the appellate courts' interpretations of the language employed by the General Assembly." *Candelaria*, ¶ 9, 303 P.3d at 1204.

¶ 51 At the time of the trial court's SVP determination, the supreme court had already announced the legal test for trial courts to apply when determining if a defendant established or promoted a relationship for SVP purposes. *See People v. Gallegos*, 2013 CO 45, 307 P.3d 1096. In *Gallegos*, the court explained that the SVP

27

statute "does not grant the [Sex Offender Management Board (SOMB)] the authority to define [the] terms" contained in the third element of the statute. *Id.* at ¶ 10, 307 P.3d at 1100. The portion of the SVPASI utilized in this case that provides definitions or criteria for the qualifying relationship types (stranger, established, or promoted) is not authorized by statute, and it is not the proper test for determining whether a defendant's relationship with the victim satisfies the SVP statute. *See id.*; *People v. Tunis*, 2013 COA 161, ¶ 39, 318 P.3d 524, 531-32 (Because the statute does not authorize the SOMB to define the phrases "established a relationship" or "promoted a relationship," the reviewing court "must disregard the two-step inquiry and underlying criteria identified in the screening instrument."). In fact, because the SOMB does not have the authority to define the terms in the relationship criterion of the SVP statute, district courts should disregard the screening instrument's description of factors for determining whether an offender established or promoted a relationship with the victim primarily for purposes of sexual victimization. *See Gallegos*, ¶ 10, 307 P.3d at 1100; *see also Tunis*, ¶ 39, 318 P.3d at 531 (after *Gallegos*, "we must disregard" the

28

screening instrument's findings regarding the relationship criterion).

¶ 52    The *Gallegos* court further held that a defendant's conduct during the commission of the sexual assault or offense cannot be used to satisfy the relationship element of the SVP statute. *Gallegos*, ¶¶ 10-21, 307 P.3d at 1101-02; *see also Uribe-Sanchez*, ¶¶ 4-11, 307 P.3d at 1091-92 (defendant's conduct during offense could not be considered in determining whether he promoted relationship with victim for purpose of sexualization); *Tunis*, ¶ 41, 318 P.3d at 532 (recognizing that reliance on the facts of the assault "is now precluded" by *Gallegos*).  To satisfy the "promoted a relationship" criterion under the SVP statute, the offender, excluding his or her behavior during the commission of the offense(s), must have "otherwise encouraged a person with whom he had a limited relationship to enter into a broader relationship primarily for the purpose of sexual victimization."  *Gallegos*, ¶¶ 14-15, 307 P.3d at 1100-01.

## D.   Analysis

¶ 53     Here, the district court erred in not using the legal definitions established in *Gallegos*.  Thus, a remand is necessary for the trial court to apply those definitions after making findings of fact.

¶ 54     The SVPASI concluded Salas did not meet the "stranger" criterion or the "established a relationship" criterion but met the "promoted a relationship" criterion.  While the district court designated Salas as an SVP "based on the assessment," it made no factual findings on whether Salas "encouraged" the victim "to enter into a broader relationship primarily for the purpose of sexual victimization," as required by statute.  *See, e.g., id.* at ¶¶ 14-17, 307 P.3d at 1100-01; *Tunis*, ¶¶ 37-40, 318 P.3d at 531-32.

¶ 55     The People assert that because the PSI and SVPASI included other accounts of sexual assault between Salas and the victim and because the court explicitly stated that it was relying on the assessment in making its determination, the court did not err in designating Salas as an SVP.  However, "we examine the court's findings and the testimony at the sentencing hearing using the definition in *Gallegos* . . . ."  *Tunis*, ¶ 39, 318 P.3d at 532.  Because the court relied on the screening instrument's description of factors

when determining whether Salas met the relationship criterion of the SVP statute and made no findings on any of the criteria in the statute, we are unable to determine whether the court erred in designating Salas an SVP.

¶ 56    Having determined that the court should not have relied on the screening instrument for its finding that Salas met the relationship criterion of the SVP statute, we next consider whether that error requires reversal, as Salas asserts.

¶ 57    We conclude that the error committed in this case was plain. It was obvious because the court did not follow the holding in *Gallegos* in making its own factual findings relevant to whether Salas was an SVP. While evidence in the record might support the conclusion that Salas either established or promoted a relationship with the victim primarily for purposes of sexual victimization under the *Gallegos* standards, the court did not make specific factual findings on the matter. Other evidence might lead to the opposite conclusion. We perceive that such error was substantial and casts serious doubt on the reliability of the SVP designation. Therefore, we vacate the court's SVP designation and remand to the trial court

so that it can make specific findings of fact regarding Salas' SVP designation.  *See Gallegos*, ¶ 2, 307 P.3d 1098.

## V.    Conclusion

¶ 58    Accordingly, the judgment and sentence are affirmed.  The SVP designation is vacated, and the case is remanded to the trial court to make specific findings of fact supporting its determination whether Salas is an SVP, including regarding the relationship criterion of the SVP statute, in accordance with the holding in *Gallegos*.

JUDGE GRAHAM and JUDGE NAVARRO concur.