The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
April 14, 2022

## 2022COA42

No. 20CA1879, *C & C Inv. v. Hummel* — Real Property — Common Interest Communities — Homeowners Associations — Dues — Foreclosure Sales — Right to Cure; Civil Procedure — Process — Service by Publication; Constitutional Law — Due Process

A division of the court of appeals considers whether a homeowners association, before proceeding with a foreclosure sale, is constitutionally required to do more than serve notice by mailing and publication. Applying the reasoning of *Jones v. Flowers*, 547 U.S. 220 (2006), the division concludes that due process requires homeowners associations to make a good faith, rather than highly technical, effort to effectuate actual notice to a homeowner before foreclosing on their property. When, as in this case, a homeowners association does not take reasonably calculated steps to serve an owner with actual notice before proceeding with a foreclosure, the

trial court does not have jurisdiction, and any resulting judgment, sheriff's sale, and confirmation deed are void ab initio.

Consistent with Colorado's foreclosure statutes and *Oakwood Holdings, LLC v. Mortgage Investments Enterprises LLC*, 2018 CO 12, the division vacates the trial court's order granting a post-foreclosure right to cure but affirms the court's order vacating the default judgment, sheriff's sale, and confirmation deed for lack of jurisdiction.

COLORADO COURT OF APPEALS      **2022COA42**

---

Court of Appeals No. 20CA1879
Larimer County District Court No. 17CV30536
Honorable Daniel M. McDonald, Judge

---

C & C Investments, LP,

Appellant,

v.

Martha L. Hummel,

Defendant-Appellee.

---

ORDERS AFFIRMED IN PART AND VACATED IN PART

Division I
Opinion by JUDGE SCHUTZ
Dailey and Fox, JJ., concur

Announced April 14, 2022

---

Hatch Ray Olsen Conant, LLC, Christopher J. Conant, Denver, Colorado, for Appellant

Law Office of Ingrid J. DeFranco, Ingrid J. DeFranco, Brighton, Colorado, for Defendant-Appellee

¶ 1     More than 2.6 million Colorado residents live in communities governed by covenants that are administered by a homeowners association. Colo. Div. of Real Est., HOA Info. & Res. Ctr., 2021 Annual Report 8, https://perma.cc/CQN4-J846. This case presents two important issues related to the foreclosure on a residence for purposes of collecting outstanding homeowners association dues. First, we address whether a trial court may exercise its equitable powers to grant a property owner a post-foreclosure right to cure. Following established precedent interpreting our current statutes, we answer "no" to that question and vacate the trial court's order. Next, we address whether a homeowners association, before proceeding with a foreclosure, is constitutionally required to do more than serve notice on the homeowner by mail and newspaper publication. Based upon the facts presented, we answer that question "yes" and therefore affirm this order, albeit for different reasons than those provided by the trial court.

I.     Factual Background

¶ 2     The pertinent facts of this case are unique and undisputed. In 1999, Martha L. Hummel purchased a home in Loveland, Colorado.

1

The home was subject to declarations and covenants that imposed monthly homeowners association dues. Amended Windsong Homeowners Association, a Colorado nonprofit corporation (HOA), administered the covenants.

¶ 3 Hummel's relationship with the HOA was uneventful for the first fifteen years of her occupancy. She timely paid her mortgage and association dues through automatic withdrawals from her checking account. In 2011, Hummel's sister, the only person with whom she socially interacted, relocated from Wyoming to Georgia. Hummel's mental health progressively deteriorated. Suffering from severe depression, she shut herself in her home for the next eight years.

¶ 4 Hummel never left her home during this period. She did not shower or change clothing during the entire time she was cloistered; she did not answer the door unless to accept delivery of the pizzas she had ordered; she stacked every pizza box around the home and never took trash or refuse to the curb for collection; and she did not retrieve her mail, so the post office eventually discontinued service to her home.

¶ 5     During this period, Hummel paid all her bills via autopayments from her checking account or credit card, including her mortgage, property taxes, and HOA dues.  She screened her few phone calls through an answering machine.  Periodically, authorities were contacted to check on her welfare, and she returned at least one phone call to adult protective services, reassuring them that she needed no assistance.

¶ 6     In 2014, the HOA hired a new management company.  Hummel was not aware of this change and was also unaware that the automatic withdrawal authorization she had previously put in place was no longer viable.  Because Hummel had not authorized payments to the new management company, her HOA dues were no longer being paid and her HOA account soon fell into arrears.  She did not receive the letters the HOA sent her advising of the deficiencies and demanding payment.

¶ 7     During this time, Hummel continued to pay her other outstanding bills.  She had nearly paid off her mortgage.  Although no formal appraisal was presented to the trial court, an HOA representative testified that homes in her neighborhood were valued between $250,000 and $300,000.

## II. The Lawsuit

¶ 8    On May 18, 2017, the HOA's governing board voted unanimously to commence a foreclosure action based upon Hummel's years of unpaid HOA dues totaling approximately $7,000. On June 28, 2017, the HOA filed suit against Hummel and her mortgage lender, First National Bank of Arizona, for judicial foreclosure and mailed the complaint and summons to Hummel. The papers were returned "undeliverable." In September of 2017, the HOA filed a motion for extension of time to serve Hummel. The motion was accompanied by an affidavit from a process server indicating that he had unsuccessfully attempted to personally serve Hummel in July of 2017 on four separate occasions. The court granted the requested extension. Despite the extension, the HOA made no additional efforts to personally serve Hummel.

### A. The HOA's Efforts to Serve Hummel by Publication

¶ 9    On November 14, 2017, the HOA filed a motion requesting permission to serve Hummel and her lender by publication. The motion referred to prior efforts to effectuate personal service on Hummel stating, "[a] search has been made of the public records of Larimer County, Colorado and its surrounding counties, and of the

4

telephone and other available directories, and various inquiries have been made to obtain information concerning the whereabouts of Defendant Hummel . . . to no avail." The motion provided no further description or documentation of the HOA's efforts to personally contact Hummel. On December 3, 2017, the trial court granted the HOA's motion for service by publication. Accordingly, notice of the foreclosure was published in the Loveland Reporter Herald. Because Hummel did not receive the newspaper and did not have the ability to access it online, she did not receive actual notice of the foreclosure suit.

### B. The HOA's Motion for Foreclosure by Default

¶ 10 In May of 2018, the HOA filed a motion for default judgment and a decree of foreclosure. The trial court held a hearing to address the motion on September 27, 2018, which counsel for the HOA and an HOA representative, but not Hummel, attended. At the hearing, the court found that neither Hummel nor her mortgage lender had been personally served. In explaining the lack of personal service, counsel for the HOA informed the court,

> It sounds like she's somewhat eccentric.
> They've tried to do wellness checks through
> the sheriff's office. And each time she will call

5

just prior to the sheriff's arrival, say everything is okay. But she seems to be somewhat of a recluse. She orders pizza to be delivered daily. And so that is going to be at least some of the reasons why personal service couldn't be affected [sic]. *But I would obviously have to make sure that other avenues of due process were, were met in order to proceed with a decree of foreclosure here.*

(Emphasis added.)

¶ 11    The trial court expressed deep concern about granting the remedy of foreclosure without providing additional notice to Hummel:

Well, and also what I would require before I would even ever consider ordering a sale; is if you can't get personal service and I know you've tried publication . . . I would also [require] you to look back into serving the mortgagee . . . which apparently is First National Bank of Arizona. *And then also post, at the very least, posting on the property itself, on the front door, notice of what's going on here and that there is a default judgment that's being entered and there's a lien and there's a request[] to foreclose on the house.*

(Emphasis added.)

¶ 12    Thus, the trial court required that the HOA post notice "on the front door" of the property before it would authorize the foreclosure by default. The HOA's counsel then reiterated the court's order: "So

6

just so I'm clear on my marching orders, you want to confirm that we've had proper posting, and if not, post it to the property, re-examine what had been done to serve the mortgagor [sic]." The court confirmed counsel's understanding.

### C. A Default Foreclosure Judgment Entered Against Hummel

¶ 13 Shortly after this hearing, new counsel entered an appearance for the HOA. On October 18, 2018, this attorney filed an amended motion for default asserting, "[a]ll named Defendants were duly and properly served. True and correct copies of the Affidavits of Service and Proof of Publications are on file with the Court and are incorporated herein by reference." The amended motion also cited legal authority permitting a homeowners association to collect its assessment lien through the remedy of foreclosure. The amended motion did not address, however, the court's prior order that the notice must also be posted on the property before any foreclosure would be permitted.

¶ 14 On February 28, 2019, without further hearing, the court granted the HOA's motion for default judgment and decree of foreclosure. In granting the motion, the court noted, "though Plaintiff is not required to post a copy of the summons and

7

complaint on Defendant's property, Plaintiff did not use this method of publication. However, the court finds that all named Defendants were duly and properly served." The court did not mention its prior order requiring that the notice be posted on the property before foreclosure would be permitted. Nor did the court vacate its prior order or state that the posting requirement had been fulfilled. The court completed the order with this notation,

> under C.R.S. 38-38-103, entering a decree of foreclosure does not allow for immediate sale of the Property, and Defendant Hummel will have an opportunity to cure the default prior to the sale. Both named Defendants will be provided with significant opportunity to pay the outstanding balance and avoid the sale of the Property.

¶ 15 A sheriff's sale of Hummel's home was conducted on June 25, 2019. Contrary to the trial court's assumption when it granted the foreclosure by default, the record contains no evidence suggesting Hummel received actual notice, whether by mail or posting, before the sheriff's sale. At the sale, C & C Investments, LP (C & C), purchased Hummel's home for $19,360.10.

D.    Hummel's Motion to Set Aside the Default Judgment

¶ 16    On August 15, 2019, C & C posted a notice to quit on Hummel's front door.  Hummel saw the notice, immediately contacted an attorney, and on August 29, 2019, filed an affidavit with the court asserting she had never been properly served and a motion to set aside the default judgment on the grounds of fraud under C.R.C.P. 60(b)(2).

¶ 17    The court set an evidentiary hearing to address the motion to set aside the default judgment.  Because of COVID-19 protocols, the hearing was delayed for several months.  During that period, the presiding judge for the case changed because of the district's rotating docket policy.  Eventually, the hearing was scheduled and held before a new judge on July 6, 2020.  By that time, C & C had been permitted to intervene in the proceedings but had not filed any claims for relief.  Leading up to the hearing, the court entered an order advising the parties:

> The Court finds that the sole issue currently
> before it is whether the default should be set
> aside.  The issue of the Sheriff's sale and title
> to the property is a separate issue that has
> been raised but not in a way that would allow
> the matter to proceed to hearing on July 6,

2020 unless both parties agree to have that issue heard as well.

¶ 18 Consistent with this directive, at the commencement of the hearing, the court clearly stated it would only address whether there were grounds to vacate the default judgment in favor of Hummel and would not address any claim to set aside the sheriff's sale until a later date.

¶ 19 Also, at the start of the hearing, the court acknowledged that it had been informed that the HOA and Hummel had reached an agreement resolving the HOA's claims that, once consummated, would result in the dismissal of the claims against Hummel. As part of this resolution, the HOA agreed not to oppose Hummel's request to vacate the default judgment. Thus, the HOA did not actively participate in the hearing. Nonetheless, the court permitted C & C to participate.

¶ 20 After addressing these preliminary matters, the court proceeded to hear the parties' evidence.

### E. The Trial Court's Findings and Conclusions

¶ 21 At the completion of the evidence and after closing arguments, the court entered findings of fact and conclusions of law. The court

began by ruling that even though the motion to set aside the default judgment was expressly filed under C.R.C.P. 60(b)(2), Hummel had adequately preserved her right to challenge the judgment under all subparts of Rule 60(b).

¶ 22 Referencing the prior court order directing the HOA to post notice on Hummel's property, the court noted, "I think the court was very clear that she wanted service by posting on the door. And then later found that it wasn't necessary, based on the fact that there was a posting on the door."[1] The court found Hummel's testimony "very compelling." The court credited her statement that during this period she was suffering from debilitating mental illness and that she had never received notice of the lawsuit or the subsequent foreclosure proceedings until the summer of 2019, when the eviction notice was posted on the door.

¶ 23 The court also heard testimony from the HOA's process server, who had filed an affidavit indicating he attempted service upon Hummel on four occasions over a sixteen-day period in July of

---

[1] Despite the statement, there is no evidence in the record to support the conclusion that the notice was ever posted on the property. Indeed, the parties agree it was not.

2017.  The court found this testimony "not very compelling" due to the process server's inability to correctly describe Hummel's home, cite the time of day he attempted service, or recall if he stayed longer than sixty seconds at Hummel's door.

¶ 24     Based upon these findings, the court concluded Hummel had demonstrated excusable neglect for her failure to timely file an answer, that she had a viable defense on the merits, and that there were "extraordinary circumstances" justifying setting aside the default judgment under Rule 60(b)(1) and (5).

¶ 25     In addition to finding excusable neglect and extraordinary circumstances, the court stated, "I do not believe there is good cause to set aside under 60(b)(2), or (3) or (4)."  But, in making this statement, the court made no reference as to whether it had personal jurisdiction over Hummel.  After its ruling, the court reiterated it was not addressing the status of the sheriff's sale because "that's a separate issue that requires a different amount of evidence, different standards, [and] different information before the court."  It ordered additional briefing by both parties on the issue of whether the court should nullify the sheriff's sale and resulting deed and scheduled a hearing date to resolve that issue.

¶ 26     On September 11, 2020, after receiving the requested briefs, the court sua sponte entered an order granting Hummel fifteen days to file a notice of intent to cure the foreclosure sale.[2]  Upon payment of the cure amount, Hummel was ordered to file a status update with the court, after which the court would declare the sheriff's sale and confirmation deed void and quiet title in Hummel.  Hummel subsequently tendered the cure funds, and the court, in turn, issued an order to quiet title in her favor and voided the sheriff's deed.  That same day, the court denied C & C's motion to reconsider the cure order, which asserted the court had no discretion to afford Hummel a post-sale right to cure under current Colorado law.

---

[2] The trial court labeled the remedy it was affording Hummel as a right to cure.  As discussed in more detail below, historically an owner had both a statutory right to cure prior to a foreclosure sale and a post-foreclosure right to redeem.  In 2008, however, the General Assembly "eliminated a homeowner's formal statutory redemption rights after the foreclosure sale and . . . combined the pre-and post-sale cure periods into one before-sale cure and payoff period."  *Oakwood Holdings, LLC v. Mortg. Invs. Enters. LLC*, 2018 CO 12, ¶ 8.  Even though the trial court's remedy was to be exercised after the foreclosure sale, for the sake of consistency, we will refer to it as a "cure" right rather than a right of redemption.

¶ 27    C & C now appeals the trial court's order affording Hummel a post-sale cure opportunity and providing that, upon such cure, the sheriff's sale and resulting confirmation deed would be vacated.

### III.    Was the Trial Court's Order Authorizing the Post-Sale Cure Proper?

¶ 28    C & C argues that the trial court erred by affording Hummel a post-foreclosure cure opportunity.  We agree.

### A.    Standard of Review

¶ 29    A trial court abuses its discretion when it misconstrues the law.  *People v. Salas*, 2017 COA 63, ¶ 30.  An appellate court reviews a trial court's application of the law de novo yet defers to the court's factual findings, which it will not disturb if they have record support.  *People v. Fuerst*, 2013 CO 28, ¶ 10.

### B.    Analysis of the Post-Sale Cure Right Granted by the Trial Court

¶ 30    Colorado's foreclosure statutes apply to foreclosures processed by a public trustee or by a sheriff and govern all processes by which a sheriff's sale occurs.  § 38-38-701(1), C.R.S. 2021.  C & C argues, and we agree, that the trial court was required to comply with section 38-38-104, C.R.S. 2021, when determining whether to allow Hummel to cure.  Section 38-38-104 expressly permits an owner to

14

cure, but to exercise that right, an owner must provide notice of intent to cure at least fifteen days prior to the sale, § 38-38-104(1), and the cure sums must be paid by noon on the day before the scheduled sale date, § 38-38-104(2)(b).  It is true that Colorado's foreclosure statutes previously permitted an owner both a pre-sale right to cure and a post-sale right to redeem.  § 38-38-302, C.R.S. 1990.  But the General Assembly eliminated an owner's post-sale right to redeem in 2008.  *Compare* Ch. 275, sec. 2, § 38-38-302, 1990 Colo. Sess. Laws 1664-65, *with* Ch. 305, sec. 21, § 38-38-302, 2006 Colo. Sess. Laws 1467.  Thus, when the trial court entered its order, an owner had no statutory right to cure after the foreclosure sale.

¶ 31    The trial court was aware of the statutory requirement that a cure must be exercised prior to sale.  The court's order stated that Hummel could exercise the right to cure it was creating "notwithstanding any subsections, such as subsections 38-38-104(1), (2)(a)(1) or (b), which require cure to be made prior to sale."  Thus, the trial court was purporting to authorize a remedy that the General Assembly had previously eliminated.

¶ 32    We appreciate that the trial court was laboring under the belief that it could fashion an equitable remedy to address the circumstances of this case.  But regardless of how it perceived its equitable powers and the equities of this situation, the trial court was not at liberty to create a remedy that did not statutorily exist. The exercise of such equitable powers was expressly rejected by the supreme court in *Oakwood Holdings, LLC v. Mortgage Investments Enterprises LLC*, 2018 CO 12, ¶ 3 ("Although a debtor-owner is sometimes entitled to cure, the statute is clear that he or she must do so before the foreclosure sale is complete . . . .").  Like the right to cure, the court also stated that the right to redeem is not derived from principles of equity but depends entirely upon the provisions of the statute creating that right:

> [T]he right to redeem from an execution sale is a creature of statute.  The right of redemption has long been recognized as a substantive right to be exercised in strict compliance with statutory terms.  It is not a right derived from principles of equity, but depends entirely upon the provisions of the statute creating the right.

*Id.* at ¶ 14 (quoting *Johnson v. Smith*, 675 P.2d 307, 310 (Colo. 1984)).  Strict compliance with these statutory rights is required to protect persons with a stake in the process from prejudice.  *Janicek*

16

*v. Obsideo, LLC*, 271 P.3d 1133, 1139 (Colo. App. 2011). Thus, the supreme court held, these rights may not be expanded by judicial interpretation. *Oakwood Holdings*, ¶ 14.

¶ 33 The trial court's order granting Hummel a post-sale right to cure is contrary to these established principles. Accordingly, we vacate that portion of the order.

## IV. Whether the Decree of Foreclosure Should be Vacated and the Sheriff's Deed Set Aside

¶ 34 C & C also takes issue with the trial court's order that, upon Hummel tendering the cure amount, the court would "declare the sheriff's sale and confirmation deed void, and quiet title in Ms. Hummel." Consistent with this order, Hummel timely paid the amounts due to C & C under the court's order. The cure proceeds were released to C & C to repay the amounts it bid at the foreclosure sale plus subsequently incurred holding costs, and the trial court voided the sheriff's sale and confirmation deed. C & C contends the court erred by entering these orders.

### A. Standard of Review

¶ 35 Whether the trial court properly ordered a foreclosure by default presents a mixed question of fact and law. We review the

17

trial court's factual findings for clear error and its legal conclusions de novo. *People v. Miller*, 75 P.3d 1108, 1111-12 (Colo. 2002).

### B.    Consequences of Setting Aside a Default Judgment

¶ 36    When a default judgment is set aside, the original judgment may either be reopened or vacated. *See, e.g.*, *Weaver Constr. Co. v. Dist. Ct.*, 190 Colo. 227, 231, 545 P.2d 1042, 1045 (1976). Because the default judgment was not set aside at the July 2020 hearing, C & C argues the sheriff's sale and resulting deed remain valid.

¶ 37    *Weaver* counsels that when a default judgment "is *opened* the defendant is allowed to answer to the merits of the claim, but the original judgment and judgment lien remain in effect as security pending the resolution of the trial on the merits." *Id.* at 232, 545 P.2d at 1045. But *Weaver* also teaches,

> if a judgment results in plaintiff's favor after the original judgment is *opened* for a trial on the merits, his judgment lien will remain in full force and effect as if the original default judgment had not been *opened*. If a judgment results in favor of the defendant . . . then the original default judgment is *vacated* — the judgment and judgment lien are dissolved as though they never existed. Therefore, generally, the court must refrain from *vacating* a default judgment until after the *opened* judgment results in a new judgment on the merits.

18

*Id.* In contrast to an opened judgment, when a default judgment is set aside on jurisdictional grounds, the underlying judgment and any subsequent foreclosure sale are void and treated as if they never existed. *Id.*

## C. Did the Trial Court Have Jurisdiction to Enter the Foreclosure Decree?

¶ 38 Contending the trial court only opened the underlying judgment, C & C argues the court lacked jurisdiction to vacate the judgment and resulting sheriff's deed. We disagree but for reasons different than those articulated by the trial court. *See, e.g.*, *Roque v. Allstate Ins. Co.*, 2012 COA 10, ¶ 7 ("We can affirm for any reason supported by the record, even reasons not decided by the trial court."). Recall that Hummel has consistently argued since her entry into this case that she did not receive adequate notice of these proceedings. This argument challenges the trial court's jurisdiction to enter the foreclosure order in the first instance. But the trial court did not fully resolve this essential question. Because jurisdiction is a necessary prerequisite to the enforceability of any order, we must address and resolve that question.

¶ 39    C & C concedes, and we agree, that if the trial court lacked jurisdiction, the judgment and resulting sheriff's deed must be set aside.  *See, e.g., Davidson Chevrolet, Inc. v. City & Cnty. of Denver*, 138 Colo. 171, 173-76, 330 P.2d 1116, 1118-19 (1958).  We conclude the trial court failed to expressly rule on the question of whether it had sufficient jurisdiction.  Nonetheless, we conclude that the trial court made adequate factual findings to allow us to resolve this question as a matter of law.

1.    An Association's Duties When Enforcing Covenants

¶ 40    The Colorado Common Interest Ownership Act (CCIOA) creates a comprehensive framework for the creation and operation of common interest communities.  *Rancho Escondido Prop. Owners Ass'n v. Redstone Mgmt. Co.*, 169 P.3d 270, 273 (Colo. App. 2007).  Assessment liens created under its provisions "may be foreclosed [by an association] in like manner as a mortgage on real estate."  *Id.* (quoting § 38-33.3-316(11)(a), C.R.S. 2021).  Although an association is not the government, it serves "quasi-governmental functions" when enforcing covenants and must abide by the due process requirements of the United States and Colorado Constitutions.  *See Colo. Homes, Ltd. v. Loerch-Wilson*, 43 P.3d 718,

20

722 (Colo. App. 2001) (recognizing fiduciary obligations owed to homeowners based upon "the power held by homeowner associations, the quasi-governmental functions they serve, and the impact on value and enjoyment that can result from the failure to enforce covenants").

### 2. General Service Requirements for Actions Involving Real Estate

¶ 41    As C & C correctly notes, the HOA was proceeding in rem — that is, against Hummel's property, rather than against her personally — when pursuing its foreclosure remedy.  And, as C & C also notes, C.R.C.P. 4(g) contemplates mailing and publication as a means of effectuating "other service" when jurisdiction over property is sought:

> Except as otherwise provided by law, service by mail or publication shall be allowed only in actions affecting specific property . . . .  The court, if satisfied that due diligence has been used to obtain personal service or that efforts to obtain the same would have been to no avail, shall:
>
> (1) Order the party to send by registered or certified mail a copy of the process addressed to such person at such address, requesting a return receipt signed by the addressee only . . . , or

21

> (2) Order publication of the process in a newspaper published in the county in which the action is pending. Such publication shall be made once each week for five successive weeks. Within 14 days after the order the party shall mail a copy of the process to each person whose address or last known address has been stated in the motion and file proof thereof. . . .

In this case, the trial court's initial written order permitted "other service" by publication in the newspaper. C & C argues that since the HOA published notice in the newspaper in accordance with the order, it fulfilled the requirements of Rule 4(g), and therefore we must conclude the trial court had sufficient jurisdiction to enter a default judgment of foreclosure. We disagree.

¶ 42 C & C's error is predicated upon an assumption that compliance with Rule 4(g) is, under all circumstances, sufficient to confer adequate jurisdiction to allow a foreclosure to proceed. Yet in addition to compliance with Rule 4(g), an association must also meet the mandates of due process before foreclosing on an individual's property.

¶ 43 Before turning to the specific case law upon which we base our conclusion, we amplify the trial court's intuitive statement that it would require, "at the very least, posting on the property itself, on

22

the front door" before it would authorize foreclosure by default. Similarly, at the same hearing, counsel for the HOA conceded he "would obviously have to make sure that other avenues of due process were . . . met in order to proceed with a decree of foreclosure here." These statements were grounded in counsel's and the court's appreciation that due process may well require something more than mailing or publication in a newspaper before a foreclosure could move forward by default. They were right. *See, e.g.*, *Owens v. Tergeson*, 2015 COA 164, ¶ 40 ("Compliance with [the rules of procedure regarding service by publication], however, is not the end of the matter." (citing *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 315 (1950))). Unfortunately, the trial court lost sight of these principles and entered the foreclosure order by default without ensuring that the requirements of due process had been satisfied.[3] That omission does not relieve us of the obligation

---

[3] We appreciate trial courts are always in a difficult position when acting upon motions for default judgment because the party who will be adversely affected by the ruling is not before the court and assisting to ensure its rights are protected. Because of these vulnerabilities, the trial court has an obligation to be extra vigilant to ensure basic due process principles have been satisfied before entering a default judgment.

to ensure that the entry of the judgment was consistent with due process.

### 3. Due Process Requirements when Foreclosing an Association's Lien

¶ 44    Despite the ancient and often unhelpful distinction between actions in rem and in personam, *see Mullane*, 339 U.S. at 312-13 (discussing the origins of the terms in rem, quasi in rem, and in personam, and their limited value when assessing the degree of diligent inquiry and notice required to fulfill the constitutional mandates of due process), or the requirements of a particular statute or rule of procedure that addresses service in foreclosure actions, the United States Supreme Court has long held that when foreclosing a lien against an individual's home, due process requires "notice [that is] reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 314. Moreover, this is not a generalized "check the box" exercise, but rather "[t]he means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Id.* at 315.

¶ 45   The Court's decision in *Jones v. Flowers* is particularly instructive.  547 U.S. 220 (2006).  The State of Arkansas held a tax lien against Flowers' residence, which he no longer occupied.  *Id.* at 223.  After years of nonpayment of taxes, the state commenced a tax sale and notified Flowers by certified mail, which met the notice requirements of the applicable state statute.  *Id.* at 223-24.  The letter was returned unclaimed.  *Id.* at 224.  The state also published notice of the sale in a local newspaper.  *Id.*  The sale proceeded without Flowers receiving actual notice, and a third party purchased the home.  *Id.*  The purchaser then posted an eviction notice on the property, and the tenant brought the sale to the attention of Flowers, who promptly moved to set aside the sale based upon *Mullane* and its progeny.  *Id.* at 224-25.

¶ 46   Writing for the majority, Chief Justice Roberts conveyed the Court's holding: "[W]hen mailed notice of a tax sale is returned unclaimed, the State must take additional reasonable steps to attempt to provide notice to the property owner before selling his property, if it is practicable to do so."  *Id.* at 225.

¶ 47   In rejecting the state's argument that the mailing and subsequent publication were sufficient to meet the requirements of

due process, Chief Justice Roberts noted, "we have required the government to consider unique information about an intended recipient regardless of whether a statutory scheme is reasonably calculated to provide notice in the ordinary case." *Id.* at 230. The Court held that the state's knowledge that the normal procedures were ineffective triggered its obligation to take additional steps to effectuate notice. *Id.* While recognizing that the type of additional steps will vary from case to case, the Court stated, "posting notice on real property is 'a singularly appropriate and effective way of ensuring that a person . . . is actually apprised of proceedings against him.'" *Id.* at 236 (quoting *Greene v. Lindsey*, 456 U.S. 444, 452-53 (1982)); *see also Long v. Pippin*, 914 P.2d 529, 532 (Colo. App. 1996) (posting on door coupled with certified mailing were sufficient to provide homeowner notice of tax sale).

¶ 48    The holdings and rationale of *Mullane* and *Flowers* are particularly instructive in the homeowners association setting. Homeowners associations have extraordinary powers and authority under CCIOA. They may record a lien against an individual's home to recover delinquent assessments and enforce such liens by foreclosure. They are permitted to charge and recover late fees,

interest, and attorney fees related to the nonpayment and enforcement mechanisms. Typically, the lien and foreclosure rights are directed toward an individual's home. And unlike many larger agencies, an association is typically governed by volunteers who live in the same neighborhood as the property that is the subject of the foreclosure action. Such familiarity can also provide insight into the intangible circumstances of the homeowner who is the subject of the foreclosure action. Given these dynamics, it is not unreasonable to require a homeowners association to make a good faith, rather than a highly technical, effort to effectuate actual notice to a fellow neighbor before foreclosing on their property.

¶ 49    Applying these principles to the undisputed facts presented on appeal, it is manifest that the HOA did not take reasonable steps calculated to provide Hummel with actual notice of the lawsuit or the resulting sheriff's sale. Recall that the trial court did not find credible the testimony from the process server that he attempted personal service upon Hummel. Even if the court had deemed that testimony credible, it reflects an attempt at personal service that spanned only sixteen days in a case that was pending for years.

27

¶ 50    In addition, recall that in September of 2018, the HOA's counsel acknowledged he knew that Hummel was a "recluse" who did not answer her door except to take pizza deliveries, and that she was occasionally the subject of welfare checks by adult social services.  Indeed, after reciting these facts, the HOA's counsel acknowledged to the court, "I would obviously have to make sure that other avenues of due process were . . . met in order to proceed with a decree of foreclosure here."  It was these same concerns that prompted the original trial judge to require "at the very least, posting on the property itself, on the front door, notice of what's going on here and that there is a default judgment that's being entered and there's a lien and there's a request[] to foreclose on the house."  Yet despite these acknowledgments by both counsel and the trial court, the HOA never posted notice on the property.

¶ 51    Given these undisputed facts, we conclude the HOA failed to achieve service that meets the strictures of due process.  To the extent that any of the trial court's orders could be interpreted otherwise, we conclude any such orders are inconsistent with Hummel's right to due process.  Accordingly, we conclude the trial court did not have adequate jurisdiction, and the default judgment

and resulting sheriff's sale and confirmation deed were void ab initio and were properly vacated by the trial court.

¶ 52     Finally, we note that C & C has been made whole by actions taken in response to the trial court's prior orders.  It obtained the return of the money it paid at the foreclosure sale, and it recovered all holding costs it incurred between the time it took title and when the sheriff's deed was vacated.  While we recognize C & C will not realize the windfall profit it would have received had the confirmation deed been validated, both principles of law and equity mandate this result.

## V.     C & C's Request for Attorney Fees

¶ 53     Considering our resolution of the appeal, coupled with the fact that C & C was not bringing an action to enforce the HOA covenants, rules, or regulations, we conclude C & C is not entitled to an award of attorney fees on appeal.  *See* § 38-33.3-123(1)(c), C.R.S. 2021 ("In any civil action to enforce or defend the provisions of this article or of the declaration, bylaws, articles, or rules and regulations, the court shall award reasonable attorney fees, costs, and costs of collection to the prevailing party.").

## VI. Conclusion

¶ 54    For the reasons stated, we vacate the trial court's order granting a post-foreclosure cure remedy but affirm the order of the court vacating the default judgment, the sheriff's sale, and the confirmation deed.

JUDGE DAILEY and JUDGE FOX concur.